625 So.2d 1112 (1993)
Jack E. CUTTING, Plaintiff-Appellee-Appellant,
v.
Gail CUTTING, Defendant-Appellant-Appellee.
No. 92-1358.
Court of Appeal of Louisiana, Third Circuit.
October 6, 1993.
*1113 A Steven William Hale, for Jack E. Cutting.
Rudie Ray Soileau Jr. and David LeRoy Hoskins, for Gail Cutting.
Before DOUCET, KNOLL and DECUIR, JJ.
KNOLL, Judge.
This is an appeal from a judgment partitioning the community that formerly existed between Gail and Jack E. Cutting.
Gail appeals, asserting that the trial court erred in: (1) its valuation of the disputed community assets; (2) characterizing certain *1114 community liabilities as her separate debts; and, (3) determining the reimbursements owed by the parties concerning the community residence. Jack also appeals the trial court's ruling that Gail was entitled to elect the method of payment to her of her portion of the Reynolds Metals Company Savings and Retirement Plan (Reynolds Metals Plan). For reasons which follow, we affirm the trial court's judgment as amended.

FACTS
The Cuttings married in Arkansas on May 13, 1981. Both had children from previous marriages. In January of 1984, the couple moved to Lake Charles, Louisiana where they purchased a home. Gail, Jack, and Gail's two minor children from her previous marriage, lived in the home until the Cuttings' physical separation on February 9, 1989. From that date, Jack retained the sole use and occupancy of the house until it was sold on April 30, 1991. The Cuttings legally separated on March 7, 1989, and were divorced on June 27, 1990. On April 25, 1990, Gail requested a partition of the community property.
The trial court heard the partition proceeding on December 10, 1990. On October 24, 1991, in written reasons, the trial court assigned values to and apportioned the assets and debts of the community. On May 4, 1992, Gail moved to reopen the matter for the limited purpose of adducing evidence pertinent to the entry of a Qualified Domestics Relations Order (QDRO) disposing of the parties' proportionate shares of the Reynolds Metals Plan in accordance with the trial court's written reasons for judgment. The trial court granted the motion and accepted additional evidence via joint offerings and stipulations. The trial court entered written reasons concerning the QDRO on September 8, 1992.
On September 24, 1992, after valuing and apportioning the assets and liabilities, the trial court signed a judgment which allocated the assets and debts between the parties. This original judgment erroneously ordered Gail to pay $104.79 to Jack. On the same day, the trial court corrected the judgment to order Jack to pay Gail $192.70. It also declared Gail to be entitled to a ½ interest in that portion of the benefits ultimately payable under the Reynolds Metals Plan which are attributable to Jack's employment during the existence of the community property regime, a period of 8.203 years. From this judgment, both parties bring this appeal.

VALUATION OF COMMUNITY ASSETS
Gail attacks the trial court's valuation of three disputed community assets, namely, the 1984 Nissan Maxima, the 1987 Nissan Pathfinder, and the Reynolds Metals Plan.
At trial, Jack submitted an appraisal from Lakeside National Bank which valued the Pathfinder at $10,475 and the Maxima at $4,250. Gail submitted an appraisal from National Bank of Commerce which valued the Pathfinder at $11,000 and the Maxima at $3,100. Neither party called the appraisers as witnesses at trial. Gail contends that the trial court erred because the LNB appraisal contained a high mileage deduction for the Pathfinder, which had 55,000 miles, but did not contain a high mileage deduction for the Maxima, which had over 100,000 miles.
LSA-R.S. 9:2801(4)(c) provides in pertinent part that, "[i]n allocating assets and liabilities, the court may divide a particular asset or liability equally or unequally or may allocate it in its entirety to one of the spouses...." The trial court has great discretion in partitioning community property, and it is not required to accept at face value a spouse's valuation of assets or debts, or claims against the community. Breaux v. Breaux, 555 So.2d 1001 (La.App. 3rd Cir. 1990). Confronted with the appraisals and in absence of live testimony concerning the method of calculating appraised values, the trial court valued the Pathfinder at $10,737.50 and the Maxima at $3,675. We cannot say that this median figure constituted an abuse of the trial court's discretion.
Next, Gail attacks the trial court's valuation of the Reynolds Metals Plan. The record shows that Jack had participated in the savings plan since its inception in 1976 or 1977. Prior to his marriage on May 13, 1981, he had invested $7,171.57 of separate funds. This figure is supported by Jack's testimony *1115 and a joint exhibit reporting a balance of $7,171.57 as of June 30, 1981, approximately 48 days after the marriage. To ascertain the value of the plan as of the date the community terminated, March 7, 1989, the parties introduced one report showing a value of the plan of $42,806.77 as of December 31, 1988, 66 days prior to the termination of the community regime, and one showing a value of $46,718.07 as of June 30, 1989, 115 days after the termination of the community regime.[1]
The trial court accepted Jack's argument that the $7,171.57 value as of June 30, 1981, represented a separate property contribution and subtracted that amount to calculate community property contributions to the plan. In doing so, the suggested valuation would be between $35,635.50 and $39,546.50. The trial court apparently valued the account at a median figure of $37,581.81.
Gail contests this valuation. First, she contends that the $7,171.57 should not be subtracted because under Louisiana law, separate funds commingled with community funds are deemed as a matter of law to be the first funds withdrawn. She maintains that because Jack withdrew $12,000 to $13,000 during the marriage, he necessarily removed the entirety of the separate property funds from the plan.
Our jurisprudence shows that when separate funds are commingled with community funds to the extent that the separate funds are no longer capable of identification, and it is impossible to trace the origin of the funds, then all of the funds are considered community. See, e.g., Thibodaux v. Thibodaux, 577 So.2d 758 (La.App. 1st Cir.1991). Jack argues that the funds are clearly traceable and were not commingled to the extent that it is impossible to establish which funds belong to the separate and community estate and, thus, Succession of Sonnier, 208 So.2d 562 (La.App. 3rd Cir.1968), is inapplicable and the court need not allocate the $12,000-$13,000 from the separate funds first.
In Sonnier, a deposit of $17,500 was made from Jean Batiste Ardoin's separate funds. Subsequently withdrawals amounting to $8,645.36 were made from the account before the death of his wife, Evangeline Sonnier. The Third Circuit stated at page 569:
"Since there is a presumption that all of the funds in the checking account belonged to the community, and the burden rests on Ardoin to establish the contrary, it seems proper to us to regard all of the withdrawals made from this account during the period beginning November 10, 1965, and ending May 22, 1966, as having come from Ardoin's separate funds. This leaves a balance of $8,854.64 in the checking account at the time of Evangeline Sonnier's death which the evidence establishes as belonging to the separate estate of Ardoin. The remaining balance of $2523.87 which was in the checking account at the time of her death must be classified as community property." (Citation omitted.)
We are further persuaded by Professor Katherine Sphat's comments[2] concerning the presumption in Sonnier:
"... [There is a] presumption that withdrawals from an account in which community and separate funds are commingled are presumed to come first from separate funds. This may or may not have a basis in reality, but it would seem to be a corollary consistent with the presumption of community; what remains in the account is subject to the presumption. At least one author suggests this approach is a reasonable one: `There is a problem, of course, when community and separate fungibles or funds have been placed in a single pool or account from which withdrawals have been made without records over so long a period as to make a tracing of values impossible. In that case it may be legitimate to have a presumption in favor of the community character of the thing, for in this way the most any spouse could lose under the formula is half of that to which he would have been entitled." (Footnotes omitted.)
In Succession of Russo, 246 So.2d 26 (La. App. 4th Cir.1971), writ denied, 258 La. 760, 247 So.2d 861 (1971), Mrs. Russo had opened *1116 an account with $8,966.32 of separate funds. With the exception of credits to the account for interest earned, the only other deposits made were two totaling $343 of admittedly community funds. As of the date of her death, the balance in the account, after various withdrawals, was $7,521.09. The Fourth Circuit found it clear that the commingling of the amount deposited originally by Mrs. Russo and the $343 of community funds is inconsequential and did not cause the funds to lose their separate identities. The court then recognized that in conformity with the rationale of Sonnier, all subsequent withdrawals from such an account are made from separate funds. The court found that the withdrawals came first from Mrs. Russo's separate funds, the $343 community property was preserved, and the remaining sum was Mrs. Russo's separate property.
We find the present case analogous to the Russo case. In the present case, the separate and community funds were commingled, but not to the extent as to cause the funds to lose their identities.[3] Under the rationale of Russo, the withdrawals come first from separate funds. Thus, without evidence to the contrary, we presume that the $12,000 to $13,000 withdrawn by Jack first depleted his separate funds of $7,171.57. As such, we conclude that the trial court erred in deducting the $7,171.57 from the total amount of funds in the account when the community regime terminated. Thus, we find that the savings plan should be valued at $42,806.77 as of December 31, 1988, and $46,718.07 as of June 30, 1989.
Gail also contends that the trial court should have prorated to determine the value of the account instead of dividing the difference between the values as of December 31, 1988, and June 30, 1989, to determine its value as of March 7, 1989. We agree and prorate to recalculate the value of the account as of March 7, 1989. We determine that this value equals $44,232.37 ($21.60 per day for 66 days [$1,425.60] plus the beginning balance, $42,806.77) as of March 7, 1989, the date the community terminated.
Next, Gail contends that the trial court failed to consider the investment return of the plan which she alleges amounts to a return between 9% and 10%. However, Gail failed to submit any evidence to value the account based on an assumed average return of 9% to 10%. At trial, Jack, under cross-examination stated that he did not know what, if any, investment return the community received on this savings and investment plan. The trial court after hearing and evaluating the testimony was obviously not satisfied that Gail had met her burden of proving that the account earned any assumed rate of return. Thus, we find no error by the trial court in not adding a rate of return to its valuation of the account.

CHARACTERIZATION OF COMMUNITY LIABILITIES
In her next contention of error, Gail argues that the trial court erred in characterizing the following accounts as her separate liabilities:

Beall-Ladymon: $ 614.28
FNB VISA: 1,426.98
Citibank VISA: 5,025.16
Discover: 1,162.83
Gaidry's: 810.24
Commercial Securities: 2,100.00
Commercial Credit: 1,235.17
 __________
 Total: $12,374.66

LSA-C.C. Art. 2361 provides:
"Except as provided in Article 2363, all obligations incurred by a spouse during the existence of a community property regime are presumed to be community obligations."
Article 2363 provides in pertinent part:
"A separate obligation of a spouse is one incurred by that spouse prior to the establishment of a community property regime, or one incurred during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse."
*1117 At trial, Jack testified that he was unaware of the existence of several of the accounts and does not know how the use of the accounts resulted in any benefit to the community or himself, or what purchases or transactions were made. Gail and Jack testified that Jack knew of the Beall-Ladymon account, but did not know what type of purchases were made. Gail testified that she purchased items for her children from a prior marriage, Lance and Laurie, and for Jack, Jack's mother, and his son.
She admitted that she opened the First National Bank Visa account by forging Jack's signature on the application. She does not recall what purchases she made on that account. With the Citibank Visa account, Gail remembers that the majority of purchases on that account were for the children, and herself, and she remembers purchasing tires. Admittedly, these were made without Jack's knowledge. Also, she requested cash advances to pay her car insurance and other bills. She charged more unidentified purchases without Jack's knowledge on the Discover Card and Gaidry's account, and obtained a loan with Commercial Securities. Furthermore, she obtained a loan from Commercial Credit, which she used to help her son.
Although neither party could identify the specific purchases made through the disputed accounts, Gail did describe the types of purchases and payments she made such as, clothing for herself and her children, various bill payments, school supplies, tires and insurance for her car, and items for Jack, and his mother and his son. These expenditures presumptively benefitted the community. See, e.g., Ledet v. Ledet, 496 So.2d 381 (La. App. 4th Cir.1986); First Security Bank & Trust Co. v. Dooley, 480 So.2d 842 (La.App. 2nd Cir.1985); but, see, First Nat. Bank of Commerce v. Ordoyne, 528 So.2d 1068 (La. App. 5th Cir.1988), writ denied, 532 So.2d 179 (La.1988), in which the court found that under Article 2363, the presumption of community status does not apply to "[a]n obligation resulting from an intentional wrong not perpetrated for the benefit of the community."
Jack relies on the fact that he never knew of nor approved many of the purchases. However, Gail was not required to obtain his consent. See, Ledet, supra. In fact under LSA-C.C. Art. 2346, either spouse acting alone may manage, control, or dispose of community property unless otherwise provided by law. Comment (a) to article 2346 states:
"This provision establishes the principle of equal management of community property. Each spouse has the right to manage community property without the consent or concurrence of the other spouse unless otherwise provided by law."
The exceptions to LSA-C.C. Art. 2346 are set forth in LSA-C.C. Art. 2347, but none apply to the instant case. Thus, by law, Gail had the managerial authority to incur a community obligation, notwithstanding the lack of her husband's consent or concurrence.
Furthermore, Jack relies on the fact that some of the debts were incurred for the daily living expenses and necessities of Lance and Laurie, Gail's children from a prior marriage. Jack's argument overlooks LSA-C.C. Arts. 227 and 2362.
Under Article 227 parents have an alimentary obligation imposed by law to provide their children with nourishment, lodging, support, and education. Article 2362 further characterizes a spouse's alimentary obligation as a community obligation. As noted by Professor Janet Mary Riley in her law review article, Matrimonial Regimes Law, 26 Loyola Law Review 500 (1980), these obligations do not fit the general definition of community obligations. When a parent, such as Gail, fulfills her alimentary obligation, it is a community obligation and the non-parent spouse may not demand repayment. See also, Connell v. Connell, 331 So.2d 4 (La.1976).
In conclusion, we find that the trial court erred in characterizing the above listed disputed liabilities as Gail's separate obligations because Jack failed to rebut the presumption that the liabilities are community. Therefore, we amend the trial court's judgment to reflect these obligations as community.

*1118 REIMBURSEMENT
We easily resolve Gail's assignment of error that the trial court erroneously calculated the total reimbursement due Jack from Gail for mortgage payments made on the community home by him after the termination of the community. The parties agree, and the record supports that the total reimbursement due is $8,158.80, not $8,257.23 as the trial court calculated.
Next, Gail attacks the trial court's failure to award her claim for rental value for Jack's use and occupancy of the community home. The decision to award rent to a nonoccupant spouse rests within the discretion of the trial court. LSA-R.S. 9:374; Jones v. Jones, 605 So.2d 689 (La.App. 2nd Cir.1992), writ denied, 607 So.2d 571 (La.1992); Rozier v. Rozier, 583 So.2d 87 (La.App. 3rd Cir. 1991).
In the present case, the trial court found that:
"[t]here was no evidence furnished at trial of this matter which supports any claim for rental value owed to Mrs. Cutting by Mr. Cutting. The Court does not recognize this claim. See La. Revised Statutes 9:374, Bolden v. Bolden, 524 So.2d 10 (La. App. 1st Cir.1988) and Wochomurka v. Wochomurka, 552 So.2d 405 (La.App. 1st Cir.1989)."
Gail asserts that Jack's expert appraiser established a fair rental value of $625 for the family residence. Holly Heard, the expert appraiser, testified as follows:
"Q. You have a lot of information about this house, of course. What's the rental value of this home?
A. Oh, I'm not familiar with the rental areas out there, but usuallyLet me just look at something here.
Q. Yes, sir.
A. I'd say $625 a month."
The trial court apparently concluded that the estimated rental value was merely speculative. We cannot find that the trial court's refusal to award Gail rent for Jack's occupancy of the community home was an abuse of discretion. Thus, we find that this assignment of error lacks merit.
In conclusion, we amend the apportionment of the assets and liabilities as follows:

 COMMUNITY ASSETS
 Trial Court's Amended
Description Value Value
 1. Sale proceeds, 3717 Pin Oak Court 35,930.46
 2. Reynolds Savings & Investment Plan 37,581.81 44,232.37
 3. 1984 Nissan Maxima 3,675.00
 4. 1987 Nissan Pathfinder (subject to mtg) 5,481.50
 5. 1986 Boat, Motor & Trailer 2,800.00
 6. Credit Union Account # 137 1,075.00
 7. Gail Cutting Retirement Fund 1,936.62
 8. LNB Savings Account 2,322.64
 9. LNB Checking Account 837.88
10. FNB Checking Account 396.45
11. Reynolds Retirement Plan Sims v. Sims (Presently incalculable)
 ________________________________________
 Total Assets: 92,037.36 98,687.92
 COMMUNITY LIABILITIES
 1. Sears, Roebuck (438.00)
 2. LNB VISA (48.00)
 3. Beall-Ladymon (614.28)
 4. FNB VISA (1,426.98)
 5. Citibank VISA (5,025.16)
 6. Discover (1,162.83)
 7. Gaidry's (810.24)
 8. Commercial Securities (2,100.00)
 9. Commercial Credit (1,235.17)
 ____________
Total Liabilities: (12,860.66)

*1119
 RECAPITULATION
Total Assets: 92,037.36 98,687.92
Total Liabilities: (486.00) (12,860.66)
 __________ ____________
Net Value of Community: 91,551.36 85,827.26
Net Value of ½ Interest: 45,775.68 42,913.63
 PARTITION OF COMMUNITY ASSETS AND LIABILITIES
 TO JACK CUTTING
 1. ½ proceeds, 3717 Pin Oak Court 17,965.23
 2. Reynolds Savings & Investment Plan 37,581.81 44,232.37
 3. 1987 Nissan Pathfinder ( & mtg) 5,481.50
 4. 1986 Boat, Motor, & Trailer 2,800.00
 5. Credit Union Account # 137 1,075.00
 6. LNB Savings Account 2,322.64
 7. LNB Checking Account 837.88
 8. Reynolds Retirement Plan (Sims v. Sims) (Presently incalculable)
 __________________________________
Total Value Distributed: 68,064.06 74,714.62
 Liabilities
 1. Sears, Roebuck (438.00)
 2. LNB VISA (48.00)
 __________
Total Liabilities Distributed: (486.00)
Net Value Distributed: 67,578.06 74,228.62
 TO GAIL CUTTING
 Assets
 1. ½ proceeds, 3717 Pin Oak Court 17,965.23
 2. 1984 Nissan Maxima 3,675.00
 3. Gail Cutting Retirement Fund 1,936.62
 4. FNB Checking Account 396.45
 5. Reynolds Retirement Plan (Sims v. Sims) (Presently incalculable)
 ______________________________________
Total Value Distributed: 23,973.30
 Liabilities
None 0.00
 1. Beall-Ladymon (614.28)
 2. FNB VISA (1,426.98)
 3. Citibank VISA (5,025.16)
 4. Discover (1,162.83)
 5. Gaidry's (810.24)
 6. Commercial Securities (2,100.00)
 7. Commercial Credit (1,235.17)
 _____________
Total Liabilities (12,374.66)
Net Value Distributed: 23,973.30 11,598.64
 CREDITS TO JACK CUTTING
 1. Alimony advanced to defendant 1,600.00
 2. ½ mortgage payments made with separate funds 8,257.23 8,158.80
 3. ½ separate funds invested in community property 11,752.50
 __________
Total Additional Credits: 21,609.73 21,511.30

Our amendments require adjusting the cash pay-out to Gail. Jack is entitled to receive a value equal to one-half the net *1120 value of the community ($42,913.63), plus the additional credits due him ($21,511.30), for a total entitlement of $64,424.93. Gail is entitled to her one-half interest in the net value of the community ($42,913.63), less credits due Jack ($21,511.30), for a total of $21,402.33.
The net value of the actual distribution in kind to Jack is $74,228.62. If we subtract his $64,424.93 entitlement from this amount, we find that he obtained $9,803.69 more than his entitlement. The net value of actual distribution to Gail is $23,973.30, $9,803.69 less than her entitlement ($42,913.63 minus $11,598.64 liabilities allocated to her minus credits to Jack of $21,511.30). Therefore, we order Jack to pay Gail $9,803.69 plus legal interest thereon from date of judicial demand until paid.
We note that the trial court awarded legal interest on the equalizing cash payment due to Gail from the date of judicial demand, until paid. Because Jack did not assign this as error, we pretermit any discussion on the correctness of this legal interest award. See, Vice v. Vice, 567 So.2d 774 (La.App. 3rd Cir.1990); Barbin v. Barbin, 546 So.2d 609 (La.App. 3rd Cir.1989); and, compare, Oliver v. Oliver, 561 So.2d 908 (La.App. 2nd Cir. 1990).

RETIREMENT PLAN
Jack appeals the trial court's judgment, asserting that it committed manifest error when it ruled that Gail was entitled to determine how her portion of the benefits in the Reynolds Metals Plan be paid.
On May 4, 1992, Gail moved the trial court to reopen the evidence pertinent to the entry of a QDRO[4] to determine whether Gail's proportionate benefits should be paid in the form of a joint and 50% survivor's annuity or in the form of a straight life annuity. In written reasons for judgment dated September 8, 1992, the trial court addressed the issue of who may select the manner by which each spouses' interest in the plan is to be paid and from what source it is to be paid. The trial court stated:
"Mrs. Cutting, as an owner of the interest that she possesses, is entitled to determine how her portion is to be paid. Her selection of a method will in no way affect the way Mr. Cutting will be paid. Her selection does not prohibit Mr. Cutting from selecting any other manner of payment that he may chose [sic] with reference to his interest in the Plan. She would not gain any benefit other than the right to receive as much as she can from the interest that she owns in the Plan.... [S]he does have the right to designate how that proportionate interest and only that proportionate interest should be paid."
Under the straight life annuity option, the amount of the total retirement benefits payable would be calculated in accordance with the provisions of the Reynolds Metals Plan. That portion of the total benefits owned by Gail would then be calculated in accordance with the Sims v. Sims formula, and would be paid directly to her. The difference between Gail's benefit amount and total benefit amount would be paid directly to Jack. Under this option, all benefits payable to Gail would terminate upon Jack's death.
Under the qualified joint and 50% survivor annuity option, the amount of the total retirement benefits would be calculated, and that amount would be reduced in accordance with *1121 the provisions of the Plan in order to pay the cost of the joint and 50% survivor annuity option. That portion of the net benefits owned by Gail would then be calculated in accordance with the Sims formula, and would be paid directly to her. The difference between Gail's benefit amount and the net benefit amount would then be paid to Jack. Under this option, the amount of the benefits paid to Jack and to Gail during Jack's lifetime would be less than the amount of the benefits paid under the straight life annuity option. In addition, the amount of the benefits paid to Jack's present wife after his death should he elect to provide her with a survivor annuity would likewise be less than the benefit amount she would receive if Gail received a straight life annuity. The benefits payable to Gail under this option, however, would not terminate upon Jack's death. Rather, Gail would continue to receive 50% of her original benefit amount for her lifetime.
The right to receive benefits payable from the retirement plan, whether in the form of a straight life annuity or 50% survivor annuity, is, to the extent attributable to the spouse's employment during the community, a community asset. Sims v. Sims, 358 So.2d 919 (La.1978); Johnson v. Johnson, 532 So.2d 503 (La.App. 1st Cir.1988). Our jurisprudence, however, has not been extended to recognize that a non-employee spouse may dictate how the retirement funds are invested and ultimately paid.
When the community is dissolved, the non-employee spouse is entitled to have her interest in the employee spouse's pension rights recognized. Sims, supra; Johnson, supra. Only if and when the employee spouse decides to retire will the retirement benefits become payable. Sims, supra. Until that time, the monetary value cannot be fixed.
The Sims opinion recognizes the difficulty of valuing annuities until distribution because of the numerous variables which affect the ultimate pay-out. Allowing a former spouse to dictate how her portion of her ex-husband's retirement benefits will be paid will add more uncertainty to the valuation computation, further complicating investment practices. The possibility of several former spouses and/or a current spouse, as in the present case, further complicates the issue. Thus, we find that allowing the non-employee spouse to elect the method of payment is undesirable. Furthermore, in Sims, footnote 4, the court noted that until the husband retired, "the community's retirement-plan interest, as yet inchoate, is in annuities or lump-sum payments to become payable in the future, as determined by the husband's good-faith election of options available to him...." (Emphasis added). Katherine Spaht in her article "To Divide or Not to Divide the Community Interest in an Unmatured Pension: Present Cash Value v. Fixed Percentage, 53 La.L.Rev. 3 (Jan 1993) recognizes the duty of the employee spouse to exercise control of the co-owned asset in good faith. We find that the employee spouse, Jack Cutting, not the non-employee spouse, Gail Cutting, has the right to elect, in good faith, the retirement annuity option. Thus, we amend the trial court's decision regarding this issue.

CONCLUSION
In summary, we affirm the trial court's valuation of the Nissan automobiles; we amend the trial court's valuation of the Reynolds Metals Plan to a value of $44,232.37; we recharacterize as community liabilities certain accounts which the trial court found to be Gail's separate liabilities; we amend the reimbursement due Jack from Gail for mortgage payments made on the community home to $8,158.80; and we deny Gail's claim for rental value for Jack's use and occupancy of the community home. The above is support for our judgment ordering Jack to pay Gail $9,803.69 plus legal interest thereon from date of judicial demand until paid. Additionally, we amend the trial court's judgment insofar as it allows Gail to elect how her portion of Jack's retirement benefits is to be paid. We find that Jack, the employee spouse, maintains the right to make the good faith election of retirement options.
For the above and foregoing reasons, the judgment of the trial court is affirmed as amended. Costs of this appeal are assessed equally between Jack and Gail Cutting.
*1122 AFFIRMED AS AMENDED AND RENDERED.
NOTES
[1] Valuations were reported every 6 months.
[2] K. Spaht & W. Hargrave, 16 Louisiana Civil Law Treatise, Matrimonial Regimes § 4.5 at 131 (1989).
[3] The record does not show specifically how the funds were used, but merely states that the funds were ultimately exhausted.
[4] The QDRO provides in part in paragraph 5:

"[t]he portion of the benefits payable under the Plan that are attributable to the Participant's employment during the existence of the community property regime shall be computed by multiplying (a) the amount of the total benefits payable under the Plan as of the date such payments begin in the form of a qualified joint and 50% survivor annuity, after applying all applicable reductions, times (b) a fraction, the numerator of which is 8.203 years, and the denominator of which is equal to the Participant's total years of pension service under the Plan as of the date payments begin.
The Participant may receive benefits in any form of annuity permitted under the Plan, so long as the benefit payable to the Alternate Payee under this formula is computed on the basis of the Participant's being paid in the form of a qualified joint and 50% survivor annuity."
Paragraph 7 provides that the alternate payee shall be treated as a spouse under the Plan for purposes of post-retirement survivor benefits to the extent of the proportionate share described in paragraph 5.