895 So.2d 807 (2005)
Lisa Womack GILL, Plaintiff-Appellant
v.
Craig Gerard GILL, Defendant-Appellant.
No. 39,406-CA.
Court of Appeal of Louisiana, Second Circuit.
March 9, 2005.
*809 John Scott Sartin, for Plaintiff-Appellant.
Samuel T. Singer, Winnsboro, for Defendant-Appellant.
Before WILLIAMS, STEWART and CARAWAY, JJ.
*810 CARAWAY, J.
In this case, the trial court divided the community property acquired during the parties' marriage and awarded certain reimbursement claims. Both parties have appealed, raising numerous issues regarding the valuation and division of the property. We amend the judgment in part, and as amended, affirm the partition of the community property.

Facts
Lisa and Craig Gill were married on September 19, 1999. The couple began their marriage residing in the home of Lisa and her previous husband, who had died of cancer in 1998. Lisa had two sons. One of the boys resided with Lisa when she married Craig.
In June of 2000, Lisa and Craig purchased a new house and fifteen acres of land for the sum of $170,000. Lisa used $113,697 of her separate property for the purchase of the home, closing costs and improvements to the house.[1] The remaining value of the house and property was financed through Winnsboro State Bank.
Lisa and her previous husband had worked together as accountants in the couple's CPA business. After his death, Lisa continued the business alone. She purchased a new office building prior to her marriage to Craig and borrowed the $62,000 purchase price for that building and an additional $18,000 for renovation. Upon Lisa's remarriage, the notes for the building were paid from a community account.
The checking account for Lisa's business was located at Winnsboro State Bank. Lisa also had a separate checking account with that institution in which she generally placed child support payments which she received from another of her former husbands. She also deposited the sale proceeds from her prior office building and certain life insurance proceeds into that separate account. Craig maintained a separate checking account at Franklin State Bank. The parties also had joint accounts at Progressive Bank and Citizens Progressive Bank.
Prior to marrying Craig, Lisa owned a vehicle, the payments for which were made from community funds after the marriage. Lisa traded this vehicle in for a 2000 Ford Expedition and added $8,000 from her separate Winnsboro State Bank Account to the purchase. By the time of trial, Lisa had purchased a 2003 Ford Expedition after trading in the community vehicle.
At the time of the marriage, Craig worked as a funeral director with Riser Funeral Home in Winnsboro. These earnings were placed into their joint account at Progressive State Bank. On June 8, 2001, Craig and Lisa purchased the Riser Funeral Home for the price of $375,000. Lisa utilized $45,000 of her separate funds as a down payment. The transaction for the acquisition of the business actually placed title to the immovable property in Craig and Lisa. The price listed in the deed for the land and building for the funeral home was the entire $375,000 purchase price for the business.
Earlier, on May 14, 2001, Craig and Lisa formed a limited liability company named Gill First National Funeral Home, LLC ("Gill LLC") relating to the operation of the business. The articles of organization of Gill LLC gave Lisa and Craig fifty percent ownership of company stock and named them both as managers and members of the company. The articles of organization *811 also required a majority vote of the members for matters arising in the regular course of business. Lisa and Craig leased the lot and building to Gill LLC for the monthly sum of $3,300, of which $3,150 was paid monthly on the business debt. In addition to owning the funeral home, Craig assumed his previous vocation of funeral director and embalmer. Like before, Craig's salary was deposited into a joint community account. After the parties' separation in May of 2002, Craig's salary increased from $40,000 to $75,000 annually.
By January of 2002, Craig moved out of the family home and began residing in the funeral home. Lisa filed for divorce on February 20, 2002, and the parties were granted a judgment of divorce on February 6, 2003. When the parties could not amicably settle the community, trial for the partition of property occurred in June and December 2003. In relevant part, the trial court valued the subject properties and classified as community property the house and fifteen acres, the land and building for Gill First National Funeral Home, Gill LLC, Lisa's CPA practice, the 2000 Ford vehicle, and the parties' checking accounts. Community debt consisted of the loans relating to the purchase of the funeral home, the house and land and the 2000 Ford vehicle.
In partitioning the assets, the trial court awarded Lisa the house and fifteen acres, the 2000 Ford vehicle, some house furniture and certain bank accounts with balances totaling $7,911.81. Craig was allocated the land and building for the funeral home, Gill LLC and two trailers. The court assessed Craig with $115,102.02 and Lisa with $46,122.25 in reimbursements and, after partition of the assets, ordered Craig to pay Lisa an equalizing payment in the amount of $20,167.05 (including the $3,915 contained in Craig's Franklin State Bank checking account). Both parties appeal the court's valuation of Gill LLC and Lisa's CPA practice and certain reimbursements.

Discussion
Louisiana law defines the matrimonial regime as "a system of principles and rules governing the ownership and management of the property of married persons as between themselves and toward third persons." La. C.C. art. 2325. There is a presumption in the law that all married persons living in Louisiana are under the legal regime of acquets and gains (community property). Under Louisiana law, property is characterized as either community or separate. La. C.C. art. 2335. Property acquired during the existence of the community is presumed to be community, but either spouse may rebut the presumption and prove the separate nature of the property. La. C.C. art. 2340. The classification of property as separate or community is fixed at the time of its acquisition. Robinson v. Robinson, 99-3097 (La.1/17/01), 778 So.2d 1105. Community property is comprised of property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; property acquired with community things or with community and separate things, unless classified as separate property; property donated to the spouses jointly; natural and civil fruits of community property; damages awarded for loss or injury to a thing belonging to the community; and all other property not classified by law as separate. Id. A person's separate estate is comprised, among other things, of property acquired by a spouse prior to the establishment of a community property regime and property acquired by a spouse with separate things or with separate and community things when the value of the community things is inconsequential *812 in comparison with the value of the separate thing used. Id.
Former spouses continue to be co-owners of the former community property even after the termination of the community and until it has been finally partitioned. La. C.C. arts. 2369, 2369.1; Ellington v. Ellington, 36,943 (La.App.2d Cir.3/18/03), 842 So.2d 1160, writ denied, 03-1092 (La.6/27/03), 847 So.2d 1269. In allocating the community assets and liabilities, the court may divide a particular asset or liability equally or unequally or may allocate it in its entirety to one of the spouses. The court must consider the nature and source of the asset or liability, the economic condition of each spouse and any other circumstance the court deems relevant. La. R.S. 9:2801; Ellington, supra. The court is required to divide the community assets and liabilities so that each spouse receives property of an equal net value. In order to avoid an unequal net distribution of assets and liabilities, the court may order the payment of an equalizing sum of money. La. R.S. 9:2801.
The court shall value the assets at the time of trial on the merits, determine the liabilities, and adjudicate the claims of the parties. Ellington, supra. When the parties do not submit evidence of the current value of community assets, the trial court does not err in making its valuations based upon the evidence presented by the parties. Id. The trial court has broad discretion in partitioning community property. Id. The purpose of La. R.S. 9:2801 is to provide an occasion for the court to get a handle on the situation. It does not mean that the court is frozen by any statutory time level or particular valuation at any particular time or for any particular purpose, but simply to place a value on the assets for the purpose of accounting, allocation and adjudication. Ellington, supra; Razzaghe-Ashrafi v. Razzaghe-Ashrafi, 558 So.2d 1368 (La.App. 3d Cir.1990).
The excess value of a business enterprise beyond the buildings, inventory, and contracts is goodwill. Under Louisiana law, goodwill is recognized as an incidental property right in connection with commercial businesses which are capable of sale and transfer from one owner to another. Head v. Head, 30,585 (La.App.2d Cir.5/22/98), 714 So.2d 231. If the underlying business is community, the goodwill should be and will be considered in dividing the community property as part of the partition. Id.
More complicated is the situation in which a person's professional practice is to be valued. A professional degree or license relating to a spouse's earning power is not community property and is not subject to community property distribution. La. C.C. art. 121, Official Revision Comment (f); K. Spaht and W. Hargrave, Matrimonial Regimes, § 2.6, at 35, in 16 Louisiana Civil Law Treatise (2d Ed.1997). To the extent that goodwill represents future earning prospects of a spouse, it may be considered a personal attribute not subject to distribution as community. K. Spaht and W. Hargrave, Matrimonial Regimes, § 2.6, at 38-39, in 16 Louisiana Civil Law Treatise (2d Ed.1997). With a professional corporation, where the goodwill results solely from the identity of the professional or from his or her relationship with clients or patients, goodwill is not included in the community. Head, supra; Chance v. Chance, 29,591 (La.App.2d Cir.5/7/97), 694 So.2d 613; Collier v. Collier 00-1263 (La.App. 3d Cir.7/18/01), 790 So.2d 759, writ denied, 01-2365 (La.12/7/01), 803 So.2d 30. See also La. R.S. 9:2801.2 added by Acts 2003, No. 837 § 1 and amended by Acts 2004, No. 177 § 1 which provides that the court may include goodwill in valuing any community-owned *813 corporate, commercial or professional business. However, that portion of goodwill attributable to any personal quality of the spouse awarded the business shall not be included in the value of the business.
The court is not required to accept at face value a party's valuation of assets, debts or claims against the community. Ellington, supra; Gay v. Gay, 31,974 (La.App.2d Cir.6/16/99), 741 So.2d 149. If the trial court's valuations are reasonably supported by the record and do not constitute an abuse of discretion, its determinations should be affirmed. The law gives no mathematical formula for determining the value of community assets. Ellington, supra. Furthermore, the trial court's choice of one expert's method of valuation over that of another will not be overturned unless it is manifestly erroneous. Id. Generally, the trier of fact is not bound by expert testimony, but is to hear and weigh expert testimony in the same manner as any other evidence. Head, supra. The trier of fact is entitled to assess the credibility and accept the opinion of an expert just as with other witnesses, unless the stated reasons of the expert are patently unsound. Chance, supra.

Gill LLC
The parties presented to the trial court multiple and interrelated claims concerning Gill LLC and its value. Both parties now dispute in this appeal the trial court's valuation of that entity at $375,000. Additionally, Lisa made claims for Craig's mismanagement or breach of fiduciary duties concerning his overpayment of salary to himself and other unauthorized payments for his benefit from the LLC.[2] Last, Craig asserts that the trial court erred in its denial of his claim for reimbursement of one-half of the $18,900 he paid on the funeral home note from July 1, 2003, through the time of trial.
The resolution of these claims is complicated by the fact that the ownership of the assets utilized in the funeral home business was a unique mix of the parties' personal and corporate (LLC) interests. Also, the goodwill of the established local funeral home business comprised a portion of the value when the business was purchased by the Gills in 2001. Goodwill, which is an intangible, underlies the parties' appraisal discussions concerning the revenue potential for the business. Nevertheless, in this case, the goodwill of the business is also interrelated with Craig's skills as the funeral home director and licensed embalmer. Craig's skills served the business before the parties' 2001 purchase of the funeral home and represent significant future value to the ongoing business.
The spouses personally owned the principal assets of the business, the lot and building for the funeral home. The parties agreed that the current appraisal of that immovable property was $250,000. The balance of the long-term debt arising from the Gills' 2001 purchase of the business totaled $332,442.82 and apparently was the Gills' personal community obligation since it is not shown on the balance sheet of Gill LLC as a liability of that entity. Gill LLC, which leased the property from the Gills on a short term lease, owned only the inventory of the funeral home along with its cash and accounts receivable. The value of those assets minus Gill LLC's liabilities was listed on the balance sheet at $57,155 as of the time of trial.
*814 In arriving at a value for the business, the trial court rejected both Craig's and Lisa's appraisals and valued the business, lot and building at $375,000, which, incidentally, was the price the parties paid for the business on June 8, 2001. For the valuation, the court had at its disposal the opinions of Lisa's expert, David Johnston, and Craig's expert, Carlton Clark. Also, a June 6, 2001 appraisal of the funeral home business in the amount of $408,000 was submitted into evidence. Johnston utilized an income-based approach and valued Gill LLC using its income potential as of the date of trial at $240,000. That amount together with the $250,000 value for the lot and building represents Lisa's claim of $490,000 as the value for the business. Clark gave an asset-based appraisal of $307,155 ($57,155 + $250,000).
There were three other claims concerning the operation of Gill LLC after the termination of the community in 2002. One was recognized, and the other two were rejected by the trial court. The court ruled that Craig had improperly raised his salary $56,000 in the months before trial, and Lisa was given a reimbursement claim for $28,000, one-half of that amount.
Next, the trial court rejected Lisa's claim for $15,853. These monies were amounts paid by Gill LLC for country club dues and Craig's church gifts. The trial court stated that its reason for rejecting these amounts was the fact that Gill LLC was a separate entity. While we recognize that this type of claim by the LLC member, Lisa, is in the nature of a separate shareholder derivative claim[3] and arguably beyond the scope of a community partition, the trial court had already begun to deal with such fiduciary/mismanagement claims regarding the LLC by awarding reimbursement to Lisa for Craig's excess salary. The parties had by their evidence clearly expanded the pleadings beyond the mere partition of their assets and personal reimbursement claims to deal with these corporate claims. Thus, the trial court's rejection of this $15,853 claim, which was undisputedly a non-business expense of Gill LLC for Craig's benefit, may be called into question.
Finally, Craig disputes the trial court's rejection of his claim for one-half of $18,900, which was the rent/mortgage payments he allegedly paid for the funeral home for six months. At trial, Craig testified that he paid these sums from his separate checking account. The checks submitted into evidence showed payment of this money on the funeral home debt, which was a community obligation. Nevertheless, the trial court ruled that the payments were made by Gill LLC, a separate entity, and not from Craig's separate funds and denied the claim.
We have reviewed all of these claims collectively because of their impact on the valuation of Gill LLC. We agree with the trial court's rejection of Lisa's high appraisal amount of $490,000, which was based upon an income analysis for the business. The future income of the business is uniquely tied to Craig's personal skills. A focus on the business assets (minus liabilities), including an amount for the goodwill of the established going concern, is the appropriate method of evaluation. Yet such evaluation must also consider the various amounts of monies overpaid to Craig or, with regard to Craig's loan payments, underpaid by Gill LLC. Nevertheless, *815 when all of the interrelated claims concerning Gill LLC are considered together, we do not find that the value which Lisa realized from the trial court's multiple rulings is manifestly erroneous.
The $375,000 value determined by the trial court was approximately $68,000 in excess of the value of the LLC's net assets and the lot and building. This excess value can be attributed to the goodwill of the established business which the Gills had acquired during their marriage. If the $307,155 asset-based value of Gill LLC is adjusted for the amounts overpaid to Craig and the payments on the funeral home debt claimed by Craig, the LLC had an asset-based value in excess of $350,000. That amount plus an amount for the goodwill of the business would make the value of the business in excess of $400,000. The trial court's calculation and rulings relating to Gill LLC employed a $375,000 community property value plus the $28,000 reimbursement received by Lisa. These amounts in excess of $400,000 are within a reasonable range for the valuation of Gill LLC. Therefore, these rulings of the trial court regarding Gill LLC are not manifestly erroneous and are affirmed. Neither party's assignments of error relating to Gill LLC necessitate an accounting adjustment to the trial court's rulings.

Lisa's CPA Practice and Building
Both parties also raise issues regarding the classification and valuation of Lisa's CPA practice and the increased value and reimbursements owed regarding the office building that housed the practice. The CPA practice is Lisa's sole proprietorship. The trial court listed the "CPA Practice as a community enterprise" with a value of $22,500. Thereafter, in the partition of community properties, the court awarded Lisa her CPA practice. Regarding the building which housed the CPA practice, the court awarded Craig a reimbursement of $10,000 for an increase in value of the building which he attempted to prove with an appraisal and other evidence. The trial court, however, denied Craig's claim for reimbursement of one-half of the payments made with community funds on Lisa's separate debt for the building for lack of proof regarding how much of the payments was applied to the principal of Lisa's debt.
Before considering the classification and valuation of the CPA practice, it is significant to note that both parties agreed to mutual reimbursements concerning the accounts receivable balances on the date of the marriage and the date of termination of the community. Lisa was reimbursed for the $13,512.85 balance of September 19, 1999, and Craig for the $14,785 balance of February 20, 2002.
At trial, Craig presented evidence through an expert witness showing the CPA practice had experienced an increase in value based on business revenues. Craig testified that he was able to introduce "a lot of people" to Lisa although he did not know who actually took business to her. He believed that his community activities had a positive effect on Lisa's business, although he admitted that the better location helped the business as well.
Lisa testified that she took most if not all of her clients with her after her husband's death and her move to the new building. She acknowledged an increase in the value of her business, but related that increase to new clients who had compensated her during the marriage.
Clearly, at the time of the marriage, Lisa's CPA practice was her separate property. Her sole proprietorship consisted primarily of her earning capacity as a CPA. The building was purchased by Lisa before the marriage although the debt installments on the building, which *816 we will consider below, were paid with community funds during the marriage. Lisa's income from her business was community property during the marriage. Yet, it remained a business after the termination of the community resting almost exclusively on Lisa's professional skill and earning power. Other than the accounts receivable which the parties resolved by agreement, there was no other increase in the tangible assets of the business which Craig is asserting. The trial court therefore erred in classifying the business as community property. This, however, does not mean that Craig cannot claim reimbursement for certain enhancements to the value of this separate property business.
If the separate property of a spouse has increased in value as a result of the uncompensated common labor or industry of the spouses, the other spouse is entitled to be reimbursed from the spouse whose property has increased in value one-half of the increase attributed to the common labor. La. C.C. art. 2368. Once the claimant spouse has proven the property is separate and it increased in value, in order to prevail under Article 2368 he or she must then prove common or community labor of the spouses was expended on the separate property. Salley v. Salley, 95-0387 (La.10/16/95), 661 So.2d 437. It is enough to show that the labor of either spouse was expended. Id. The "common labor or industry of the spouses" means the labor of either spouse during the existence of the marriage. Thus the word "common" as used in this article is synonymous with community. Id.
Lisa contends that the trial court erred in granting Craig reimbursement in the amount of $10,000 for an increase in value of her CPA building. She asserts there was no proof that Craig's uncompensated efforts secured the increase in value. The building had increased in value due to renovation work which she paid for through the $18,000 renovation loan executed immediately before the marriage. The renovations consisted of flooring, carpentry, plumbing, heating and phone installation by paid contractors, all of which she believed increased the value of the building. Lisa testified that these renovations which occurred after the marriage took weeks to complete and that Craig spent four or five hours taking down metal shelving in the building.
In proof of his claim for reimbursement, Craig submitted the appraisal of Gary Don Robinson, who valued the building at $90,000 as of June 10, 2003. The evidence also included the deed of the building to Lisa dated August 9, 1999, for the sum of $62,000. Craig testified that he spent more than a day or a week working in the building, although he could not specifically remember how much time he spent working there. He admitted that paid contractors came in and did work on the building.
While the trial court gave no reason for its recognition of the $10,000 reimbursement claim, the ruling appears to be based on the appraisal information which compared Lisa's cost for the building and its renovation of $80,000 to the $90,000 value of the building at the time of trial. That increase in the value of the separate property, however, did not result because of the operation of the principle reflected in La. C.C. art. 2368. It resulted from the general economic appreciation in the real estate market. Additionally, we do not find that Craig's incidental work activities in the building during its renovation justify a reimbursement claim under Article 2368. Accordingly, the trial court's grant of $10,000 to Craig for reimbursement is reversed.
Craig also argues that the trial court erred in failing to award him reimbursement in the amount of $23,199.53 for community *817 funds used to pay Lisa's separate obligations for the debt on the CPA building. At trial, Lisa testified that most of her income during the marriage came from use of the building.
A separate obligation of a spouse is one incurred by that spouse prior to the establishment of a community property regime, or one incurred during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse. La. C.C. art. 2363. If community property has been used to satisfy a separate obligation of a spouse, the other spouse is entitled to reimbursement upon termination of the community to one-half of the amount or value that the community property had at the time it was used. La. C.C. art. 2364. Nevertheless, interest on a separate debt is chargeable to the community where the debt is part of the price of (or secured by mortgage on) separate property which itself produces revenue. Hurta v. Hurta, 260 So.2d 324 (La.App. 4th Cir.1972). Wages are the premier community asset acquired through the effort, skill or industry of either spouse. Ross v. Ross, 02-2984 (La.10/21/03), 857 So.2d 384, 390 quoting K. Spaht and W. Hargrave, Matrimonial Regimes, § 3.3 in 16 Louisiana Civil Law Treatise (2d Ed.1997); La. C.C. art. 2338.
A recent ruling applying Article 2364 addressed mortgage payments during the marriage made for separate debt on a spouse's separate property which neither generated rent nor was used to benefit the community as the family home. Munson v. Munson, 00-348 (La.App. 3d Cir.10/4/00), 772 So.2d 141, 145-146. The trial court awarded the reimbursement under Article 2364 for one-half of the total mortgage payment, including principal and interest. The spouse owing the reimbursement complained on appeal that the reimbursement should have been limited to only one-half of the portion of the payments that reduced the principal of the separate indebtedness, and not the portion applicable to the interest on the loan. The court of appeal rejected that argument regarding the interest payments since the community was not benefitted in any manner by the payment of the interest expense for the separate property. Reviewing the jurisprudence, the court distinguished the case from those situations where the separate property produced civil fruits or was used for the family home. In such cases, the "courts found an interest payment to be no more than the cost of maintaining such natural and civil fruits which arise out of a spouse's separate property but ultimately accrue to the community use or benefit." Id.
In this case, unlike Munson, Lisa's CPA building did not remain idle providing no benefit to the community while the community funds were paid on the principal and interest of her debt. The building aided in Lisa's production of community income. That income would have been less if Lisa had been required to rent another commercial building for her business. Just as mortgaged separate property can benefit the community by the production of civil fruits so that the mortgage interest expense for producing the rent need not be reimbursed to the other spouse, the enhanced community wage which resulted from the use of Lisa's building prevents Craig from claiming reimbursement of the interest expense on the building. The only benefit Lisa exclusively received was the pay down of the principal balance on her debt and was subject to Article 2364's reimbursement in this case.
The trial court ruled that while Craig proved the use of community funds to pay Lisa's separate debt on the building, he *818 did not establish what portion of the mortgage payments reduced the principal of the debt. His claim was denied. Our review of the record confirms this absence of evidence. Accordingly, the trial court's ruling is affirmed.
Additionally, a similar claim for reimbursement under Article 2364 was made by Craig for the mortgage payments made on Lisa's separate property home in which the couple first resided. Again, based on the above authority, Craig's reimbursement claim would be limited to the amount of community payments that reduced the principal of Lisa's debt. No breakdown of the payments between principal and interest was established in Craig's evidence, so that the trial court's rejection of that reimbursement claim must also be affirmed.
Lisa's Reimbursement Claims for Auto and Home Debt Payments
The trial court's ruling effectively assigned Lisa the value of the 2000 Ford vehicle as of the time of her 2003 sale of the vehicle which occurred after the marriage terminated. That value was $2,107.89 ($13,440 value minus $11,332.11 loan amount). The trial court rejected Lisa's reimbursement under La. C.C. art. 2365[4] which addresses reimbursement claims for satisfaction of community obligations with a spouse's separate property. She asserts that such reimbursement should be based upon her payments on the car loan between the date of termination of the community and her sale of the vehicle in 2003.
Another of Lisa's reimbursement claims under Article 2365 concerns her payments on the family home mortgage. Lisa continued to live in the home after the marriage without agreement between the spouses or court order governing the occupancy of the home. The partition placed full ownership of the home in her name. The record indicates that the parties stipulated that Lisa paid $20,401 on the home mortgage debt from February 2, 2002 until December of 2003.
Interpreting Article 2365 for community automobile debt, the courts have held that a spouse who has the exclusive use of an automobile following the termination of the community is not entitled to credit for notes she paid on the vehicle. See, Bergeron v. Bergeron, 96-1586 (La.App. 3d Cir.4/9/97), 693 So.2d 199; Preis v. Preis, 94-442 (La.App. 3d Cir.11/2/94), 649 So.2d 593, writs denied, 94-2939, 94-2942 (La.1/27/95), 649 So.2d 392. Davezac v. Davezac, 483 So.2d 1197 (La.App. 4th Cir.1986), explained that this occurs because an automobile rapidly depreciates so that its use is directly related to its depreciation. We agree with this reasoning. The car note payments by the spouse using the vehicle are considered as payment for the depreciation caused by such use. Therefore, the trial court's rejection of this reimbursement claim is affirmed.
Regarding the family home, however, reimbursement under Article 2365 is viewed differently. The rapid depreciation *819 concept is not present for a home, the value of which more typically appreciates. Also, the use of the family home after the termination of the community is the subject of the special statutory provision, La. R.S. 9:374(C),[5] which allows for the possibility of an adjudication and award of rent for the use of the home in favor of the non-occupying spouse. When the non-occupying spouse seeks no court ruling under the statute or reaches no agreement with the other spouse for the payment of rent, the general rule of the law of co-ownership applies and "neither [spouse] becomes indebted to the other for his personal occupancy." McCarroll v. McCarroll, 96-2700 (La.10/21/97), 701 So.2d 1280, 1290; La. C.C. arts. 2369.1 and 802. Thus, under the ruling in McCarroll interpreting these principles, the non-occupying spouse is barred from receiving a retroactive assessment of rent to a spouse whose occupancy was not the result of a court order imposing rent or an agreement for including rent.
In the absence of receiving rent, which would serve to offset all or a portion of an Article 2365 reimbursement claim against him, the non-occupying spouse is required to reimburse the occupying spouse for her payments on the mortgage indebtedness on the family home. Ball v. Ball, 32,851 (La.App.2d Cir.3/1/00), 757 So.2d 824. From this authority, the trial court erred in this case in not awarding Lisa her reimbursement claim for her payments on the community indebtedness after the termination of the community. That portion of the trial court's ruling is reversed.

Reimbursement to Craig for Lisa's children's expenses
The trial court granted Craig's claimed reimbursement for one-half of $30,314.69, which Lisa spent from community funds on behalf of her two sons for rent, college tuition, insurance payments and other related expenses. The record indicates that Lisa's older son was in college during the marriage and her younger son, who became a major during the marriage, also attended college. At trial, Lisa admitted that she expended these sums on her sons. On appeal, she claims error in the reimbursement.
Under Article La. C.C. art. 227 parents have an alimentary obligation imposed by law to provide their children with nourishment, lodging, support and education. La. C.C. art. 229 imposes reciprocal alimentary obligations on ascendants and descendants, and such obligation of the parent continues past the minority of the child, as long as the child is in need. Ramos v. Ramos, 425 So.2d 989, 992 (La.App. 5th Cir.1983). The alimony extends to what is necessary for the nourishment, lodging and support of the person and includes education expense when the person to whom the alimony is due is a major who is a full-time student in good standing in a secondary school and has not attained the age of nineteen. La. C.C. art. 230.
*820 La. C.C. art. 2362 further characterizes a spouse's alimentary obligation as a community obligation. When a parent fulfills her alimentary obligation, it is a community obligation and the non-parent may not demand reimbursement or repayment. Cutting v. Cutting, 625 So.2d 1112 (La.App. 3d Cir.1994), writ denied, 631 So.2d 453 (La.1994). The obligation of a parent to support his or her first family is an obligation existing during the second marriage; it is not an antenuptial debt which must be acquitted from his individual effects. Support payments are properly discharged from community funds. Connell v. Connell, 331 So.2d 4 (La.1976). Thus, in the case where a wife spends money on a daughter from a previous marriage during a second marriage and with community funds for such things as clothing, bills, school supplies and tires, the husband of the second marriage is not entitled to reimbursement for the sums expended. Cutting, supra. Use of loan funds for the education of a wife's major son's education has been held to be a community obligation when the husband does not oppose such assistance to her children. First Sec. Bank and Trust Co., v. Dooley, 480 So.2d 842 (La.App. 2d Cir.1985); Ledet v. Ledet, 496 So.2d 381 (La.App. 4th Cir.1986).
From our review of these expense items, we find that most, if not all, of the expenses fall within Lisa's alimentary obligations for her sons. Thus, they are community obligations for which no reimbursement is due to the non-parental spouse. Additionally, to the extent certain items may have fallen outside the scope of Lisa's alimentary obligation, the aid extended by the parent would be considered a gratuity made during the marriage for which reimbursement is likewise not appropriate in this case. A spouse acting alone may make a usual or customary gift of a value commensurate with the economic position of the spouses at the time of donation. La. C.C. art. 2349. Accordingly, we find that the trial court's grant of reimbursement to Craig for these items expended for Lisa's children was in error and is reversed.

Reimbursement to Lisa for Child Support Payments
The trial court also awarded Lisa for funds deposited into a community checking account totaling $5,785.50 in child support payments. Craig argues that the award was made in error due to lack of proof by Lisa to support the claim. Child support payments are considered the property of the spouse to whom they are paid. Larsen v. Larsen, 583 So.2d 854 (La.App. 1st Cir.1991), writ denied, 590 So.2d 63 (La.1991).
The mere mixing of separate funds and community funds in a bank account does not alone convert the entire account into community property. Sharp v. Sharp, 01-0969 (La.App. 4th Cir.10/2/02), 830 So.2d 328, 330, writ denied, 02-3250 (La.3/14/03), 839 So.2d 45. However, when separate funds are commingled with community funds indiscriminately so that the separate funds cannot be identified or differentiated from the community funds all the funds are characterized as community. Id. The burden of proof is on the party claiming the reimbursement to show that separate funds existed and that those funds were used for the use or benefit of the community. Id.
At trial, Lisa testified that the $5,785.50 included child support and separate money placed into a community account. She could not account for the amount of the money that constituted child support but Lisa stated that the child for whom it was provided lived at home then and benefitted from the funds. Lisa presented no documentation clearly identifying the deposits as checks received from the child's father. Accordingly, we do not find that the record *821 supports the trial court's ruling. Lisa did not meet her burden of proof and this reimbursement to her is reversed.

Double $4,000 Reimbursement
The record shows that the trial court awarded Craig two reimbursements for $4,000. One was listed as a miscellaneous amount and the other as a reimbursement for the transfer of funds into Lisa's separate account. A review of the detailed descriptive lists reveals that the two claims are the same. Lisa listed the debt as a reimbursement she owed to Craig and Craig listed the reimbursement also. Accordingly, one of the reimbursements was assessed in error and will be deleted from the judgment.[6]

Conclusion
Based upon the foregoing determinations, the trial court judgment is recast to exclude from the community assets the Lisa W. Gill CPA Practice. The remaining allocation of community assets and liabilities is affirmed. The trial court judgment ordered an equalizing payment of $16,251.23 to be made by Craig plus an additional sum contained in a checking account which is not at issue on appeal. Accordingly, the equalizing payment that Craig owes Lisa is amended to total $56,966.33 as shown on our unpublished addendum. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed equally to the parties.
AFFIRMED IN PART; REVERSED IN PART; RENDERED.
NOTES
[1] The evidence showed that Lisa brought assets including investments and life insurance proceeds into the marriage.
[2] Lisa's reimbursement claim for the $45,000 of her separate property that was used in the purchase of the business was recognized by the trial court as a reimbursement amount which is not disputed by Craig in this appeal.
[3] Pursuant to La. R.S. 12:1314, member/managers of a limited liability company stand in a fiduciary relationship with other members who may bring an action for the breach of a fiduciary duty.
[4] La. C.C. art. 2365 provides: If separate property of a spouse has been used to satisfy a community obligation, that spouse, upon termination of the community property regime, is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used. The liability of a spouse who owes reimbursement is limited to the value of his share in the community after deduction of all community obligations.

Nevertheless, if the community obligation was incurred for the ordinary and customary expenses of the marriage, or for the support, maintenance, and education of children of either spouse in keeping with the economic condition of the community, the spouse is entitled to reimbursement from the other spouse regardless of the value of that spouse's share of the community.
[5] La. R.S. 9:374(C) provides: A spouse who uses and occupies or is awarded by the court the use and occupancy of the family residence pending either the termination of the marriage or the partition of the community property in accordance with the provisions of R.S. 9:374(A) or (B) shall not be liable to the other spouse for rental for the use and occupancy, except as hereafter provided. If the court awards use and occupancy to a spouse, it shall at that time determine whether or not to award rental for the use and occupancy and, if so, the amount of the rent. The parties may agree to defer the rental issue for decision in the partition proceedings. If the parties agreed at the time of the award of use and occupancy to defer the rental issue, the court may make an award of rental retroactive to the date of the award of use and occupancy.
[6] Craig also assigned as error the failure of the trial court to address the additional issue of fault in the breakup of the marriage. The trial judge rendered no judgment regarding fault. Accordingly, any claim for spousal support remains pending and is not affected by the community property partition ruling.