418 So.2d 1368 (1982)
SUCCESSION OF Cora M. Spearing DEMAREST.
No. 12440.
Court of Appeal of Louisiana, Fourth Circuit.
May 11, 1982.
Rehearing Denied August 19, 1982.
*1369 M.H. Many, New Orleans, for defendants-appellants.
Lanny R. Zatzkis, Lynne W. Wasserman, New Orleans, for defendants-appellants.
F.A. Little, Gold, Little, Simon, Weems & Bruser, Alexandria, for defendants-appellees.
Matt J. Farley, Marian M. Berkett, Malcolm W. Monroe, Deutsch, Kerrigan & Stiles, New Orleans, in pro. per.
Guy W. Smith, J.C. Herbert, Simon, Peragine, Smith & Redfern, New Orleans, for plaintiff-appellee.
Before GULOTTA, BYRNES and WILLIAMS, JJ.
BYRNES, Judge.
Cora Spearing Demarest died testate on February 12, 1976. Her husband, Frank, had predeceased her. Of the marriage between Frank and Cora, three children were born: Lucinda Demarest Payne, Donna Demarest Melvin, and Judson Demarest. Judson Demarest predeceased his mother and is survived by four children who are appellees in this matter: Jenny Demarest, Susan Demarest, Noel Demarest, and Donna Demarest Fedderson. Donna Demarest Melvin is the mother of two children: Elizabeth Melvin Ivey and Martha Melvin Saik. All three are parties to this appeal. Lucinda Demarest Payne is the mother of two children: Sam K. Payne, Jr. and Frank Payne. Only Lucinda Demarest Payne and Sam K. Payne, Jr., however, are appellants in this matter. Lucinda Payne's husband, Sam Payne, Sr., is the executor of the estate.
Four issues have been presented on appeal. The first issue is the interpretation of a codicil in olographic form dated March 3, 1971. The second issue pertains to the payment to be made to Sam K. Payne, Jr. for accountancy work done in conjunction with the succession of Cora Spearing Demarest. The third issue deals with the appropriateness of the attorneys' fees awarded to succession attorneys, Deutsch, Kerrigan & Stiles [hereinafter "DKS"]. The fourth issue relates to the fitness of the executor and whether such allegations as have been presented to this court are grounds for his removal.
March 3, 1971 Codicil
A codicil in olographic form dated March 3,1971, was executed in proper form by the deceased. The codicil stated in pertinent part:
"Before my succession is divided equally among my children, and/or their heirs, where applicable, I desire that the disposable portion of my succession be divided equally among my surviving grandchildren. It is my intention to reduce by means of this codicil the inheritance of my children, and/or their heirs where applicable, to the forced portion required by law."
The appellant contends the deceased wanted to leave the children of Judson Demarest only their interest in the forced portion accruing to them through representation of their deceased father and leave the disposable portion of the estate to the children of Lucinda Payne and Donna Demarest Melvin. The appellees contend that the deceased left the disposable portion to all grandchildren and the forced portion to her two surviving children and four grandchildren by way of their appearing through representation of their late father.
It is well settled that if the language of a will is unambiguous on its face, such language will irrebutably be presumed to be the intention of the testator. Louisiana Code Article 1712 states:
"In the intrepretation acts of last will, the intention of the testator must principally *1370 be endeavored to be ascertained, without parting, however, from the proper signification of the terms of the testator."
In Succession of Martin, 262 So.2d 46 (La.App. 1st. Cir. 1972), the court stated:
"The court must interpret the will as written and give effect to what the testator said, not what the the court thinks the testator intended to say. In such instances, the express and not probable intent of the testator must be determined by the court."
We believe that the trial court was correct in interpreting the codicil to divide the disposable portion of Mrs. Demarest's estate equally among the eight grandchildren. Michael Little, the first attorney of record for the succession, was present at the drafting of the codicil. He testified at trial that the intention of the testator, Cora Demarest, was to treat all eight of her grandchildren equally. Little further testified that tax considerations motivated Mrs. Demarest's decision to execute this codicil to the will. Little advised Mrs. Demarest that rather than write a new will, it would be easier for her to execute a codicil to her present will. Upon ascertaining Mrs. Demarest's intent, Little drafted the codicil and took it with him to Mrs. Demarest's house the day of the signing of the codicil. In front of Little, Sam K. Payne, Sr., Sam K. Payne, Jr., and other witnesses, Mrs. Demarest transcribed the codicil in her own handwriting and signed it. At that time there was no mention of any ambiguity by either Sam K. Payne, Sr., or his son Sam K. Payne, Jr.
We note, as did the trial court, the apparently self-serving testimony of both Sam K. Payne, Sr., and his son Sam Jr. If the intent of the deceased were so obvious at the time of the signing of the codicil, an attempt would have been made by either of them to straighten out this ambiguity. Two further points do not escape the notice of this court, the first being that Sam K. Payne, Jr. stands to benefit from this interpretation of the will. The second point is that the other grandchildren who would stand to benefit from this new interpretation of the codicil, namely Payne Jr.'s brother, Frank Payne and Donna Demarest Melvin's two daughters have not appealed from the lower court's decision as to the interpretation of the codicil. We feel that the trial court was correct in its interpretation of the codicil. Michael Little, as the attorney present at the drafting of the codicil, was aware of the wishes of the deceased and testified that he drafted this codicil so as to explicitly comply with the wishes of Mrs. Demarest.
REMUNERATION TO SAM K. PAYNE, JR.
The trial court did not award any fees to Sam K. Payne, Jr., for accounting services rendered to the succession. The record indicates that Sam Payne, Jr., was informally engaged by the succession of Cora Demarest to complete an accounting due the decedent's predeceased husband's succession. Payne, Jr., seeks to collect approximately $9,500.00 for his work. Decedent Cora Demarest was executrix of her late husband's estate. As executrix, the decedent's duties included preparing a final accounting of her husband's succession, which was not done. After her death the legatees had to assess any potential liability to the Cora Demarest succession because of her failure as executrix to render a final accounting of her husband's succession. This accounting was necessary to close Frank Demarest's succession. Both appellants and appellees are in agreement that there was an accounting done by Sam Payne, Jr. which purported to clarify the problems with the succession of Frank Demarest, but at this point the agreement ends.
An affidavit by Robert P. Garic, Jr., an expert retained by Donna Demarest Melvin, her children, and the four children of Judson Demarest, stated that among other things he had reviewed and analyzed, was an accounting document prepared by Sam Payne, Jr. of the receipts and disbursements of the estate of Frank E. Demarest, from September 21,1963 through December 13,1965. Mr. Garic stated that most of the *1371 figures shown in the analysis are incorrect and misleading and do not represent a true picture of either receipts or disbursements of the succession of Frank Demarest. Garic also stated that the claimant should have known and should have informed all parties at least by the date of September 24, 1976, that it would be fruitless and certainly costly in the extreme for him to continue to attempt to balance or prepare a proper succession accounting from the incomplete data which were available to him. Garic further states that through his many years of experience as a Certified Public Accountant, duly qualified in the State of Louisiana, in his opinion, that a normal fee for the type of services rendered by Sam K. Payne, Jr. would range from $15.00 to $28.00 an hour for clerical services and $25.00 to $40.00 an hour for accounting services. The affidavit further states: "... [I]f the court should determine the services rendered had any value whatsoever in either the succession of Frank Demarest or Cora Demarest, which is highly questionable in as much as the accounting set out hereinabove does not give a true picture of either receipts or disbursements in either succession then, in the opinion of the affiant, claimant should be paid no more then $25.00 up to a maximum of $40.00 an hour for the hours spent by claimant through September 24, 1976." [Emphasis ours]
Michael Little testified that he thought that the $75.00 per hour fee asked for by Sam Payne, Jr. was rather high and stated that in his own practice his appreciation of the prevailing fees for this type of work by national firms was $60.00 per hour and that other accountants similarly situated as Sam Payne Jr. ranged anywhere from $20.00 to $40.00 per hour.
The work product of Payne, Jr. must be examined closely and completely to render a judgment as to proper compensation due him. Based on the testimony and evidence before us, this court concludes, that although the appellees have opposed payment to Payne, Jr. they did accept his report, and it did, albeit perhaps not according to normal standards, provide a benefit to the parties. Rather than remand the determination of fees back to the trial court, thus incurring more expenses to the succession, we make the determination based on the adequacy of the record before us. We award Payne, Jr. accounting fees in the amount of the $3,555.00 representing forty-four hours of clerical time at $18.00 per hour and 115 hours of professional time at $25.00 per hour. We used this lower figure based in part on information that Payne, Jr. worked out of his own home and had no one in his hire. These circumstances indicate little if any overhead incurred by Payne, Jr. in the preparation of the accounting. Coupled with the prevailing fees in this area, this court feels justified in applying the lower end of the spectrum when computing fees owed.
ATTORNEYS FEES DUE TO THE LAW FIRM OF DEUTSCH, KERRIGAN & STILES
Mrs. Demarest's legatees, with the exception of the four grandchildren by her predeceased son, Judson have appealed the award of $25,147.49 in legal fees made to DKS, attorneys of the succession, by the trial court. DKS were the third attorneys of record for the succession. The first attorney was fired by the executor in December, 1976, and was paid $6,111.75, which included his out of pocket expenses and his professional billing rate of $75.00 per hour. Basically, all of the succession assets were liquidated during his tenure, except the property located at 1451 Exposition Blvd. and the furniture located within the house. The second attorney resigned, and her fee of approximately $11,000.00 was not paid. During her tenure, the house located at 1451 Exposition Blvd. was sold. She is now listed as a creditor on the tableau of distribution.
DKS signed a contract with the executor of the succession, that provided in part for the payment to DKS of $75.00 per hour to (1) "[P]ursue payment to the CPA preparing the final accounting in the succession of Frank Demarest of his fee by the parties responsible for preparation of same.." (2) "[R]enegotiate the fee submitted by Sharon *1372 A. Perlis to the succession," and to (3) Close the succession as "promptly as possible in keeping with the best interest of the heirs". When DKS resigned as attorneys for the succession (because the attorneys handling the estate moved to a new firm) on July 3, 1979, it had logged approximately 538.62 hours (Stipulation, May 28,1960). The trial court, in its reasons for judgment, found among other things, that the fee was consistent with the letter of engagement, that the billing time of 538.62 hours was correct and authentic as to time spent by certain personnel, that although this was a simple succession there was protracted litigation based on differing interpretations of the codicil and the constant attacks on the executor, and finally that the legal services prepared by DKS were in proportion to and consistent with their duties as attorney as set forth by the letter of employment.
In affirming the trial court's decision granting the $25,147.49 legal fees, we dismiss the argument of counsel that the contract of employment was terminated and therefore the fee recovery should be based on a quantum meruit basis. Counsel for appellant cites Simon v. Metoyer, 383 So.2d 1321 (La.App. 3d. Cir. 1980), which states:
"The courts of this state uniformly held that the appointment of an attorney is a mandate revocable at the client's will. LSA-CC Art. 3028 ... The general rule is that a client has the right to discharge attorney with or without charge and upon discharging the attorney, the contract is at an end... Contract provisions is, therefore unenforceable ... however, at the time of his discharge, the attorney is entitled to compensation for services actually rendered on a quantum meruit basis." (Emphasis Ours)
The Simon case can be distinguished from the present case in that the attorneys handling the succession, Mr. Redfern and Mr. Smith, were not fired by the succession. They did indeed change their association from DKS to a new firm and in that respect DKS now has no further claim of remuneration for the succession attorneys' services.
There is no need to reduce the claim to a quantum meruit amount as in reality there has been no discharge of the principal attorneys handling the succession. The billings for their time now come, not from their old firm DKS, but their new firm. While DKS could technically be deemed to have been fired as attorney of record, this is distinguishable from the fact situation that would arise if Redfern and Smith themselves had been fired. Redfern and Smith still handle the succession and the bill of DKS, for all practical purposes, would appear to be an interim bill for the time of Redfern and Smith up until the time they left the firm. Upon leaving, while still the attorneys for the succession, they processed their billing through their new firm. Thus we cannot reconcile appellant's argument of reduction by quantum meruit based on actual benefits of the work performed by the discharged attorneys to the facts of the case.
During DKS's tenure as attorneys for the succession, the only succession property disposed of was the furniture in the house. The heirs in opposition to the attorneys' fees have stated that the attorneys have done absolutely nothing in regard to the letter of agreement signed between them and the executor. The attorneys of DKS maintain that they do not guarantee results, only that they will pursue the objectives to the best of their ability. While we agree that results are not guaranteed, we must state at this time that we are concerned that the attorneys have billed over 530 hours and the only concrete progress is that of the sale of the furniture which remained in the house at 1451 Exposition Blvd. DKS states in its brief to this court, "In the one and a half years that DKS had represented the executor, 538.62 hours of time had been registered against this file. If that time had been billed at $75.00 per hour, as the agreement provided, the fee would have been $40,396.50. This is not the fee that DKS is demanding or has ever demanded. Its claim is for $25,147.89." DKS has not charged the succession, as the agreement provided, $75.00 per hour for *1373 every person working on the file. It is quite clear to this court from the face of the agreement that the executor in no way intended that this $75.00 per hour charge would pertain to every court runner or paralegal that DKS would have working on the case. Arguably this could be considered an across the board charge for all attorneys working on the case. It is inconceivable, however, that the executor would sign this contract realizing that the $75.00 per hour charge would pertain to all employees of DKS. DKS has recognized this and in their briefs have made it very clear to the court that they have already reduced their fee by over $15,000.00. DKS maintains that this is a sufficient reduction and that the appellate court should affirm the lower court's ruling which approved the fee.
In reluctantly allowing this fee to stand, we do note that absent any claims of fraud or duress or other improprieties, a contract between two parties of equal bargaining power must be given full accord in the courts. DKS was acting on the advice and request of their client, Sam K. Payne, Sr., the executor and fiduciary, of the succession of Cora Demarest.
REMOVAL OF THE EXECUTOR, SAM K. PAYNE, SR.
A rule to remove the testamentary executor (filed in November of 1978) was dismissed in June, 1979, by the trial court judge. Certain allegations of mismanagement and breaches of fiduciary duty surfaced at this hearing, among them as follows: (1) The alleged failure to perform duties imposed upon him by law by order of the court; (2) the alleged failure and refusal to file an accounting in these proceedings, and only upon and after rule compelling the same; (3) the failure to invest substantial succession funds and the unauthorized expenditure of succession funds; (4) the advancement of funds without the authority, approval or knowledge of the court; (5) the refusal to close out the succession as soon as possible; (6) the employment of the son, Payne, Jr., as an accountant and as custodian or guard for the premises at 1451 Exposition Blvd.; (7) the alleged inability to dispose of the assets of the succession in a timely and prudent manner, more particularly, the furniture and property located at 1451 Exposition Blvd.; and (8) the manner of liquidation of PMC Corp., which the court understands represents a substantial portion of the assets of the succession.
From the opening of the succession through the date of the hearing on removal of the testamentary executor, no annual account was filed timely. The first annual account, however, was only three days late. In the matter of the second annual account, for the year 1977, a motion to compel its filing was filed with the court on February 16, 1978. Although an extension was obtained on March 31, 1978 by then-counsel DKS, the actual accounting for the year 1977 was filed on November 15, 1978. As to the third annual accounting, a letter dated February 20, 1979 requesting its filing was sent by appellant. No accounting was filed, and a rule to compel an accounting for 1978 was then filed on March 24, 1979.
The executor, by filing the annual account removed this particular cause for his removal, but the point is made that the legal fees incurred were an unnecessary expense borne by both the succession and the individual heirs.
During this period of time, all heirs and legatees except the Payne family, repeatedly protested the continuing retention of the furniture and the failure and refusal of the executor to sell or otherwise dispose of it. An auction was set for June 24-26,1977 but never took place because it was opposed by Sam Payne, Jr., acting as agent for his mother. In the letter of opposition, an offer of $19,000.00 for the entire contents of the home was made. This was rejected, but not before the executor had circulated it to all the heirs for their approval. Although this is the proper procedure, we must question the dilatory actions of the executor. From the evidence before us it appears that this offer of $19,000.00 was so ridiculously low that it would have been in the interest of the succession had Payne rejected it summarily *1374 and proceeded with the auction, thus saving the succession the expense of prolonged storage. This court does note that when the auction did take place, the gross revenue was about $60,000.00 which gave a net refund of approximately $48,000.00 received for the furniture in the house. We will hypothesize no further on the motives surrounding the auction except to say that the hints of self-dealing presented here, albeit not in themselves evidence of improprieties, do indeed once again, seriously raise the questions of the executor's true alliance. While a mere conflict of interest in itself does not warrant removal, when this conflict becomes such that it is actively tainting the administration of the succession, removal of the executor becomes necessary.
As a result of Payne Jr's. objection, no auction did in fact take place until after the sale of the house by his mother to a third party in August of 1978.[1] And so, Sam K. Payne, Jr., during the period of August 22, 1977 until approximately August 19, 1978, was being paid $25.00 a day out of the succession funds, by his father, the executor, to guard property that he himself had kept from being auctioned. The furniture during this period was located in the 1451 Exposition Blvd. residence now owned by his mother.
It is the appellant's position that the litigation resulting from the actions of the executor have caused the cost of legal services to escalate beyond all reason. To date, the total fees paid and authorized to be paid stand well in excess of $45,000.00. The descriptive list values the succession at approximately $350,000.00. In addition, what the executor cost the succession in monies already spent may not be recaptured except from the executor individually. This includes the $22,000.00 paid for guard services to his son Payne, Jr., the $10,000.00 storage charges paid for the furniture which should have been sold some two years before, and charges for professional fees of Payne, Jr., in the amount of $9,000.00, the amount now in contest, which Sam Payne, Sr., states unequivocally that he intends to pay if he remains executor of the estate. In addition, Sam Payne, Sr., is attempting to collect a $15,000.00 charge for executor of the estate well above the 2 and ½% statutory fee provided. Appellants argue that the executor has favored his family over the other legatees and heirs of the succession. Additionally it is submitted, and we do agree, that the sums he has paid, or has tried to authorize the succession to pay to his son Sam Payne, Jr., are far in excess of the reasonable compensation due for the work actually done.
The hiring of Payne, Jr. by his father to guard the furniture in the house disturbs us. Twenty dollars a day seems a bit exorbitant to this court. If we were to multiply that figure times 365 days, the yearly cost of guard service would be $7,300.00. Similarly, if we were to use the higher figure of $25.00 per day the yearly rate would be $9,125.00. It would appear to this court that the executor, acting as fiduciary, should have examined other avenues in order to find a more economical way to obtain protection for the furniture in the house. While this may be the going rate for a stationary guard, this court seriously questions the need for such protection, especially when one considers the many neighborhood services now available. We further question the amount of time spent by Payne, Jr. in guarding the premises. During this time he maintained a residence on Robert St. He was married and there is no indication that he lived at 1451 Exposition Blvd. There is no evidence before this court as to the amount of time actually spent, if any, by Payne, Jr. in guarding the Exposition Blvd. house. Clearly it appears that no more than a few hours each day were actually spent by Payne, Jr. on the premises. We also note that nowhere is it clear in the record that the executor did inquire as to the availability or feasibility of any alternative and cheaper means of providing guard service.
This court takes note that the succession executor Sam K. Payne, Sr. has not worked *1375 since 1967. For all intents and purposes Mr. Payne was the manager of the Frank Demarest estate. Although Cora Demarest was the named executrix of her late husband's estate, she did whatever her son-in-law told her. She followed his advice in all business matters. While it is not clear whether an explicit power of attorney was ever given to Mr. Payne, the record reflects that Mr. Payne did indeed write checks and handle other business matters arising from the succession of Frank Demarest. The exchanges in the transcripts which form a large portion of this record indicate to this court that from 1967 forward, Mr. Payne's sole occupation was that of administering the affairs of his mother-in-law.
The descriptive list filed in the court June 7, 1976 lists the assets of this succession as approximately $350,000.00. Due to the size of this succession, this court is concerned at the amount of fees already incurred by the succession. DKS claims their fee to be $25,147.49. Michael Little, the first attorney for the succession, was paid $6,111.75 as his fee plus an additional $131.50 for costs. Sharon Perlis, the second attorney for the succession, has a claim against the succession for her fees and cost totaling $11,784.00. Payne, Jr. received $22,000.00 for guard service and an additional $6,500.00 for the fiduciary return. The above expenditures total $71,674.74 and do not include any of the out-of-pocket expenses such as, the storage costs incurred by the executor for the furniture. When all of the incidental fees and other costs are added into this, the cost of the succession to date well exceeds one-third of the total value of the succession. This alone indicates a serious mismanagement and breach of fiduciary duty owed to the succession by the executor. This succession is not complex. It is an extremely simple succession, complicated by much in-fighting among the heirs, due in part by the actions of the executor. Additional costs, although not to be paid out of the succession but to be paid by the heirs themselves, include all of the attorneys' fees incurred by these heirs in attempting to hold the executor to the standard of care owed by him to the succession.
This court is especially concerned with the amount of attorneys' fees caused by the executor and now owing DKS. The executor, from the underlying tone of the record, appears to this court to have taken a "win at all cost" attitude when dealing with his fight among the other heirs. Such a cavalier attitude has no place and is inconsistent with the fiduciary nature of the executor's position. The executor takes the position that everything he did was opposed by the heirs and that he had no choice but to engage legal counsel to meet such opposition. The executor's bellicose relationship with the legatees and his wasteful misuse of counsel's time has caused the succession to be depleted by well over one-third of its assets and no doubt it will be depleted even further if this conduct is not brought to a halt immediately.
On July 24, 1978, a judgment was signed ordering disbursement of $250,000.00 of the estate money, minus $41,666.67 (this amount being in dispute due to the differing interpretations of the codicil) to be paid no later than August 7, 1978. On August 14, 1978 a contempt rule was filed because there was no distribution as of that date. On August 24, a motion to distribute funds to Sam Payne, Jr., and Mrs. Sam Payne, Sr., was filed in court. There is no evidence of any further distributions in record. This court does indeed wonder why the distribution was made to the executor's wife and son and no other distributions are evidenced in the record to any of the other heirs.
The matter of the interpretation of the codicil as discussed supra, seems to be another attempt by the executor to place his family in a better position than they would have been otherwise.
Counsel for the executor has pointed out that according to past case law the executor has done nothing to warrant his removal. We find a major flaw in this premise. Dealing strictly with the law as applied to the facts, we can come to no other conclusion than that the executor has breached his fiduciary duty to the succession. Article 3191 of the Code of Civil Procedure states:
*1376 That the "... [S]uccession representative is the fiduciary with respect to the succession..." The word "fiduciary" was succinctly defined by the State Supreme Court in State v. Hagerty, 251 La. 477, 205 So.2d 369 (1978):
"The word `fiduciary,' as a noun, means one who holds a thing in trust for another, a trustee; a person holding the character of a trustee, or a character analogous to that of a trustee, with respect to the trust and confidence involved in it and the scrupulous good faith and candor which it requires; a person having the duty, created by his undertaking, to act primarily for another's benefit in matters connected with such undertaking. Also more specifically, in a statute, a guardian, trustee, executor, administrator, receiver, conservator, or any person acting in any fiduciary capacity for any person, trust, or estate ..." 36A C.J.S. Fiduciary, p. 381.
We believe that applying the above law to the facts presented us can lead to no other conclusion but that the executor breached his fiduciary duty to the succession and must be removed. We have determined here that the fiduciary standard was not met. The Supreme Court in Succession of Houssiere, 247 La. 764, 174 So.2d 521 (1965), stated:
"We do not subscribe to the view ... that cases of removal for alleged mismanagement by fiduciaries should be decided on the ascertainment of legislative policy. Rather, we think the issue should be adjudged on whether the act or acts complained of constitute a mismanagement of the estate."
The Houssiere case, in our opinion, sets forth the correct application of the law as it stands right now, although the result reached is different from, and the facts of that case are not consistent with, the facts of the present case.
We are aware that the executor may not be removed because of the late filings of an annual report; but the fact that he was consistently late in filing of these reports, thus necessitating much litigation and attorneys' fees to force the filing, is a serious breach of the duty owed to the succession.
There is a strong undertone of mistrust here which we cannot say is unwarranted. Fiduciaries may not place their own interest before that of the succession. We find evidence in the record that the first attorney, Michael Little, was so worried about the actions of the executor that he sent a letter outlining his complaints to the executor. The heirs were rightly incensed over the hiring of the executor's son for guard services. These fees were far in excess of what a prudent administrator should have incurred. Michael Little, the first attorney for the succession, testified that his estimated total fees would have been approximately $20,000.00. Due to the executor's inability to make effective use of counsel, the succession will possibly be liable for triple that amount, which is another example of the executor's mismanagement. For those reasons, we find it necessary to remove Sam Payne, Sr. from his position. We remand to the lower court for the appointment of an administrator in order that the succession can be properly closed.
DECREE
We therefore decree that the lower court's interpretation of this codicil is affirmed. We further affirm the trial court's determination as to the amount of attorneys' fees due to DKS. We set the amount of accountancy fees at $3,335.00. We reverse the lower court's decision concerning the removal of the executor Sam K. Payne, Sr., and hereby decree that he is to be removed as executor of the estate effective as of the date this opinion is handed down and remand to the trial court for the naming of an administrator, with the stipulation that bond not be dispensed with. All costs of this appeal to be borne by the body of the succession.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART.
GULOTTA, J., concurs.
WILLIAMS, J., concurs with reasons.
*1377 GULOTTA, Judge, concurs.
I concur in the result.
WILLIAMS, Judge, concurs.
I agree with the result. The administration of a succession is not for the benefit of the executor or lawyers acting under his direction, but rather its true purpose is to implement the desires of the testator [in this case, testatrix] as promptly and efficiently as possible. Furthermore, the fiduciary duty owed by the executor is owed to all of the heirs of the succession equally, not a select few.

ON REHEARING
PER CURIAM.
Sam Payne Sr. and his son Sam Payne Jr. are both before this court asking for a rehearing on certain portions of our original decision in this appeal. Sam Payne Sr. is asking for a rehearing of our decision to remove him as executor for the estate, and Sam Payne Jr. is asking for a rehearing on this court's interpretation of the codicil, our determination of his accountancy fees, and our determination of the attorney's fee due the law firm of Deutsch, Kerrigan and Stiles. The rehearing is denied. We do, however, feel compelled to respond to certain portions of these petitions for rehearing in order to clarify and amplify our original opinion.
Sam Payne, Jr. contends that this court failed to give weight to the testimony introduced at trial that neither he nor Sam Payne Sr. were present with Mrs. Demarest when the will was drafted and therefore were unable to voice their concerns that the will was ambigious. We acknowledge that there is no evidence of their presence at the drafting of the will. The will, however, is not contested. The interpretation of the codicil to the will is at issue. This court directs appellant's attention to the transcript of the proceedings taken before the Hon. George C. Connolly, Jr. on Tuesday April 24, 1979, in which on page 14, the following colloquy took place:

Question: Are you familiar at all with the confection of the codicil by the decedent? The making of the codicil by the decedent?

Michael Little: Yes, I was present at a meeting, I was present at the execution of the codicil and I had discussed its contents with Mrs. Demarest and Mr. Payne, Sr. and Mr. Payne, Jr. Prior to its confection.

Question: Let's get back to its confection. What caused you or precipitated you to be in the place where the codicil was executed?

Michael Little: I was there at the request, as I understood by Mr. Payne, Sr., the request made to me by Mr. Payne, Jr....
Further, on page 16 of the transcript, the following exchange occurred:

Question: Did you have any oral discussions with her?

Michael Little: Yes, we sat in her parlor prior to the execution and discussed what we were going to do and then walked in the dining room, and she sat at the head of the dining room table and I sat to her right and Mr. Payne Sr., sat to her left, and Mr. Payne Jr. remained standing during the execution." [Emphasis ours]
Clearly both Sam Payne and his son Sam Jr., were present at the signing of the disputed codicil as was Michael Little. This court can see no mistake in our original determination of the proper weight given to all evidence in testimony concerning the interpretation of the codicil.
We agree with Sam Payne Jr. that the weight of the evidence does indeed compel our conclusion that Sam Payne Jr. was engaged by the Succession of Cora Demarest to perform certain accounting services with respect to that succession. The formality or informality of the engagement is inconsequential inasmuch as it is not determinative of our awarding of fees. We have accepted the fact that Mr. Payne Jr. was indeed engaged in performing accounting services for the succession and have awarded what we feel is the proper fee for said services. Throughout the hearing of April 24, 1979, *1378 Robert P. Garic Jr., a C.P.A., was waiting to testify with regard to the accounting fee of Sam Payne Jr. He did not testify, the trial court being of the belief that his testimony was not needed. When the attorney for Sam Payne Jr. was notified of the intent of opposing counsel to place a written statement of Garic in the record in lieu of his oral testimony he responded "You can put it in in the form of an affidavit." This affidavit was filed in the record approximately fourteen days later. This court feels that this affidavit is properly before this court in the form of a proffer. This statement in no way affected our determination of the actual engagement of Sam Payne Jr., by the succession inasmuch as that engagement had been determined to exist earlier in the record by various colloquies among counsel. This statement along with various evidence of the work product of Sam Payne Jr. was used primarily in our determination as to the amount of fee to be paid for the accounting services.
Our reference in the original opinion to the value of the succession was correct. The descriptive list in the record before us valued the succession at approximately $350,000.00. An amended descriptive list is now properly before this court. This list, although properly filed at the district court level, was not before this court prior to the petition for rehearing. This amended descriptive list lists the succession assets at $499,657.53. Even considering the amended descriptive list, this court is still of the opinion that the administrative cost of this relatively simple succession are still excessive.
WILLIAMS, Judge, concurs in part and dissents in part.
I respectfully concur in part and dissent in part from the decision of the court not to grant a rehearing.
I agree that a rehearing should not be granted on those issues outlined by the majority.
I would, however, grant a rehearing to reconsider the appropriateness of attorney's fees awarded to Deutsch, Kerrigan & Stiles.
NOTES
[1] The house was purchased by Lucinda Payne on August 22, 1977.