50,927 (La.App. 2 Cir. 9/28/16)

**IN RE SUCCESSION OF Paul Edward DYSART Plaintiff-Appellant**

**No. 50,927-CA**

Court of Appeal of Louisiana,
Second Circuit.

Judgment rendered September 28, 2016

Law Office of Anthony J. Bruscato, By: Anthony J. Bruscato, Counsel for Appellant.

Rountree Law Offices, By: James A. Rountree, Paul Loy Hurd, APLC, Counsel for Appellee.

Before CARAWAY, PITMAN & GARRETT, JJ.

PITMAN, J.

Appellant Linda Dysart, co-administratrix of the Succession of Paul Edward Dysart, appeals the judgment of the trial court that ordered the homologation of the tableau of distribution, with amendments, proposed by Appellee Georgia Dysart, co-administratrix. For the following reasons, we affirm in part and reverse in part.

## FACTS

Paul Dysart ("Decedent") died intestate on March 24, 2013. His mother Linda Dysart ("Linda") and his wife Georgia Dysart ("Georgia") were appointed as co-administratrices of his succession. The record demonstrates that Linda and Georgia had adversarial feelings toward each other, which they expressed in contentious and extensive litigation. At issue on appeal is the judgment addressing the identification, classification and valuation of assets and liabilities of the succession, determining the insolvency of the succession and ordering the homologation of Georgia's proposed tableau of distribution, with amendments. The assets and liabilities relevant to this appeal are a 2001 Tang trailer (the "2001 trailer") purchased during the marriage of Decedent and Georgia;[1] a trailer purchased by Georgia before the marriage (the "1998 trailer"); attorney fees of Georgia's attorney, Paul Hurd; and Decedent's funeral expenses paid by Linda. Other items—miscellaneous personal items, a judgment to creditor Mary McCoy, a 1989 Chevrolet Camaro (the "Camaro"), a 1978 GMC 6000 truck (the "GMC") and a 1969 Chevrolet El Camino (the "El Camino")—were included in the parties' proposed tableaus of distribution and in the trial court's judgment, but are not at issue on appeal.

On December 2, 2014, Georgia filed a petition for authority to sell community movables, to pay priority claims of the estate and to release sale proceeds as separate property of the surviving spouse. She also filed a proposed tableau of distribution. She stated that the estate is insolvent and has no cash on hand to pay its debts. She noted that, if the court approved the sale of the community movables for $500, that $500 could be used to pay Linda as reimbursement for funeral costs. She suggested that the estate abandon its claim to the GMC because the legal cost of recovering the asset exceeds its value. She proposed that the proceeds of the sale of the 2001 trailer be released to her because it is her separate property. She agreed to pay the judgment to creditor Mary McCoy because the judgment was held against her and Decedent jointly. She also noted the different valuations of the Camaro and that her counsel Mr. Hurd agreed to grant the estate a credit of $7,000 against his outstanding legal fees of $15,708.50 in exchange for the Camaro. She listed as remaining assets miscellaneous movable items valued at $500, the community interest in the El Camino and possible reimbursement claims from Linda of unknown values. She also listed remaining liabilities and their priorities. As second priority, she listed unpaid legal fees to Linda's attorney Anthony Bruscato of an undetermined amount and unpaid legal fees to Mr. Hurd. As third priority, she listed last illness expenses of $36,000. She also listed as liabilities the general debts for lot rent of $508, cleaning charge of $200, reimbursement claim of Linda for $10,600.98, reimbursement for advances of $2,553.02 to Decedent to repair the Camaro and $6,200 to judgment creditor Mary McCoy.

---

1. With the authorization of the trial court, the 2001 trailer was sold for $14,315.38 prior to trial and the proceeds were placed in the registry of the court.

On December 22, 2014, Linda filed an opposition to Georgia's proposed tableau of distribution. As disagreements, Linda listed whether the 2001 trailer is community or separate property, whether the Camaro is an asset of the succession, whether her right to be reimbursed for funeral expenses is capped at $500, how to handle the expenses of Decedent's last illness, how to value the services of the attorneys and whether the community debt owed to Mary McCoy should be settled using the funds from the sale of the 2001 trailer. She also disagreed with the ranking of the privileges and mortgages of the creditors proposed by Georgia and provided her version of a "correct" tableau of distribution. She listed the 2001 trailer as the separate property of Decedent and the miscellaneous personal items as community property. In order of privilege, she listed funeral expenses of $9,020.80, expenses of administration of an undetermined amount, expenses of last illness of an undetermined amount and the community debt owed to Mary McCoy. She stated that the costs of the last illness needed to be determined before proclaiming the succession insolvent. She argued that she should be reimbursed for the full amount of the funeral expenses, not merely $500. She agreed that the succession should abandon its claim to the GMC in her favor. She argued that the funds from the sale of the 2001 trailer should not be released to Georgia because the funds are subject to the claims of persons to whom the community was indebted. She requested that the trial court rule that the Camaro is her personal property and not an asset of the succession. She further stated that she does not agree that the community has an interest in the El Camino. She also objected to Mr. Hurd's claims for attorney fees and costs as excessive and improperly documented.

On December 30, 2014, Linda filed a motion to impose rules for succession management or, in the alternative, to remove Mr. Hurd as the succession attorney should those rules not be followed. She stated that the motions filed by Georgia, supposedly acting on behalf of the succession, were filed without consulting her, arguing that these pleadings advanced the interest of Georgia, not the succession. She stated that Georgia should not be removed as a co-administratrix, but questioned Mr. Hurd's role as counsel for the succession.

A hearing on the motion to impose rules for succession management or, in the alternative, to remove the succession attorney was held on April 27, 2015. The trial court denied the motion at Linda's cost and ruled that the filing of Georgia's proposed tableau of distribution was not an improper abuse of procedure. It noted that, when co-administrators cannot agree, one or the other must file a pleading to properly bring the issues before the court.

Also on April 27, 2015, a hearing began on Linda's opposition to Georgia's proposed tableau of distribution; Linda's answer to Georgia's petition for authority to sell community movables, to pay priority claims of estate and to release sale proceeds as separate property of surviving spouse; and on all other remaining issues regarding identification, classification and valuation of the assets and liabilities of the succession.

On cross-examination, Georgia testified that she and Decedent married on July 30, 2004, in Ouachita Parish and that they did not have a premarital contract. She stated that she lives in a trailer that she purchased in 1998. It is a rent-to-own trailer, and she still owes a balance on it. She stated that, while she and Decedent were married, renters lived in the 1998 trailer. When questioned by her counsel if community funds were used to pay her separate debt on the 1998 trailer and why the pay-

ments on the trailer and the income from renters were not included in the detailed descriptive list, she could offer no explanation. She stated that, while she and Decedent were married, she fell and broke her leg is six places and crushed her ankle. She received $42,500 in a settlement for her injuries from the insurance carrier of the building where she was injured, and Decedent received a $2,500 settlement for loss of consortium. The settlement checks were deposited into Linda's checking account at Iberia Bank on August 30, 2005. She explained that Linda's account was used because she (Georgia) and Decedent did not have a checking account. The funds she received were used to purchase the 2001 trailer in September 2005. She was shown a bill of sale from GL Homes transferring ownership to her and Decedent. She was also shown a notarized act of donation dated July 2009 signed by her and Decedent. She testified that she did not want to sign the donation, but Decedent threatened her with violence and wanted her to donate her interest in the trailer to him because he was a sex offender and did not "want to send out no postcards until he got his license straight." She also testified that she did sign the document in front of the notary, but did not express that she was signing under duress. She stated that the notary could see tears in her eyes and that she "didn't have to say a word." She further testified that two weeks after they signed the act of donation, she and Decedent reconciled and put the document in a filing cabinet. After Decedent died, the act of donation "appeared out of nowhere" in papers she received when the succession was opened. She testified that she and Decedent separated in February 2012; and, in March 2012, she moved into the 1998 trailer, while Decedent remained in the 2001 trailer. She and Defendant never divorced, and they did not have a chance to reconcile

before he died. She stated that she was told not to make any lot rental payments after Decedent's death because of the succession and noted that she had not received any medical bills for Decedent. She testified that she learned that Decedent's funeral services were handled by Kilpatrick's in West Monroe when she went to the hospital to identify his body. Kilpatrick's advised her that Linda had paid the funeral/burial costs. She stated that she "was denied the funeral." She testified that Decedent was murdered and she had read that someone had been arrested, but she did not attend any court proceedings. She stated that she received a bill from her attorney Mr. Hurd for $15,708.50, but that she thought the hourly rate was confidential. She noted that she had not paid Mr. Hurd any money. She further testified that, on the day Decedent died, she went to the 2001 trailer, whereupon Linda and her sister and daughter arrived with three law enforcement officers and "start[ed] hollering at [her] to leave."

Linda testified that she paid Decedent's entire funeral bill of approximately $9,000. She stated that Georgia signed over the 2001 trailer to Decedent and that he gave her (Linda) the act of donation. She did not pay any of Decedent's medical bills, but stated that she had seen some of them. Decedent did not have any major medical insurance at the time of his death. She testified that she and Decedent "had a bond that nobody could break" and that they worked on cars together. She stated that Georgia and Decedent had been separated for approximately three years before his death. She further stated that, on the day Decedent died, Georgia called her and told her that she was going to break into the trailer. Linda stated that she, her daughter and her sister went to the trailer, and police officers told Georgia to leave. She noted that she had access to the

trailer because a detective brought her a key. On cross-examination, she testified that Georgia did not have a key to the trailer. She stated that she (Linda) removed Decedent's personal items from the trailer and then someone (allegedly Georgia) broke into the trailer and took things. She then removed the remaining contents from the trailer, put them in storage and later released the items to Georgia.

Louis Witlock testified that he had known Decedent since 2008 and visited him at his trailer several times a week beginning in 2010. He stated that, at first, Georgia was there, but that, in 2011, Decedent made Georgia move out so that another woman could move in. From 2011 until Decedent's death, he did not see Georgia at the trailer. He noted that Decedent and Georgia had not divorced because Decedent could not afford it. He stated that he saw Linda approximately once a week at the trailer.

Jerry Reed testified that he owned the trailer park where the 2001 trailer was located and explained that the trailer lots were rented. He stated that Georgia and Decedent moved there in the summer of 2008 and lived there together "intermittently," except when they were having problems and he would see other women at the trailer. He recalled that Georgia left in the summer of 2012. He stated that Georgia paid the rent on the lot most months, Linda paid it sometimes and Decedent paid it occasionally. After Georgia and Decedent separated, Linda paid the lot rent, but he made the receipt out to Decedent.

The bench trial continued on September 8, 2015. On direct examination, Georgia testified about the July 2009 act of donation. She stated that, at the time, she was living in the 2001 trailer and had been living there since 2005 when she purchased it. She stated that she purchased the 2001 trailer with settlement money from an injury to her leg. She noted that she was in continuous possession of the 2001 trailer after she bought it. She stated that, in 2009, when she allegedly donated the trailer, "there was a lot of threat and abuse going on." She testified that "he was threatening and hollering at me, running me off the road ... he was very abusive and I was more or less told if I didn't sign over half the house he was going to come after me and my family. So I signed it over and no Sir, I did not want to sign it." She stated that Defendant did not want to move out of the trailer because he was a registered sex offender and would have had to send out notification postcards if he moved. She also stated that Decedent moved his mistress into the trailer while she was at work. Two weeks after she signed the act of donation, Decedent begged her to move back in. They reconciled and put the act of donation in a filing cabinet, and she did not see it again for four years. They never took the document to the motor vehicle department to change the title. She testified that the contents of the trailer were acquired by her and Decedent during their marriage. On the day Decedent died, she had a key to the trailer, but a police officer stopped her from entering it. She noted that Linda was there, told her that she could not touch or see anything in the trailer, and basically took control of everything. She stated that, although they were separated when he died, Decedent would call her and thought they would reconcile.

Christa Jones testified that she lived in the same trailer park as Georgia and Decedent. She stated that, on the day Decedent died, Linda arrived at the trailer with two other women and three police officers. There was a "bunch of hollering" and Linda told Georgia that she would not get anything. She noted that, in 2009, Dece-

dent and Georgia got into an altercation, Georgia left and another girl moved in; however, a few weeks later, Georgia returned and remained in the trailer until 2012.

On October 12, 2015, the trial court stated its reasons for judgment on the record in court and filed written reasons for judgment. It granted Georgia's petition for authority to sell community movables and purchase Decedent's interest for the sum of $500. It noted that the most contested issue at trial was the classification of the 2001 trailer, stating that both Georgia's settlement check for general damages and Decedent's settlement check for loss of consortium were deposited into the same back account. It found that the evidence showed that the vast majority of the funds in this account were Georgia's separate funds and that there is a presumption that the withdrawal to pay for the trailer was from Georgia's separate funds first. It addressed Linda's argument that Georgia donated the trailer to Decedent, noting that the act of donation was not an authentic act because it was not witnessed. It stated that Linda failed to prove that Georgia donated the trailer to Decedent through delivery of the trailer and donative intent. Therefore, it determined that the 2001 trailer was purchased with Georgia's separate funds, it is her separate property and she is entitled to the sale proceeds. It further determined that the Camaro, the GMC and the El Camino are Linda's property and, therefore, not assets of the succession. It also determined that the succession is insolvent and, accordingly, reduced Linda's claim for reimbursement for funeral expenses to $500. It stated that Linda's attorney Mr. Bruscato had not submitted a formal claim for attorney fees. It recognized Mr. Hurd's (Georgia's attorney) claim for attorney fees in the amount of $15,708 as a liability of the succession. It further ordered the homologation of Georgia's proposed tableau of distribution, with amendments.

On October 19, 2015, the trial court signed a judgment denying Linda's motion to set rules for succession administration or, alternatively, to remove succession attorney; granting Georgia's petition for authority to sell community movables, to pay priority claims and to release sale proceeds as separate property; and granting Georgia's homologation of tableau of distribution, with modifications, resulting in the distribution of succession assets as approved and homologated by it. It also declared that Decedent's estate was insolvent. It ordered the co-administratrices to pay Linda $500 in full satisfaction of all sums owed by the estate for the cost of Decedent's funeral. It found that the proceeds derived from the sale of the 2001 trailer are Georgia's separate property and that the Camaro, the GMC and the El Camino are Linda's property. It further ordered the co-administratrices to sell the movable property of Decedent to Georgia for $500. It also ordered Georgia to compromise the judgment against herself and Decedent with a payment of $3,000 to Mary McCoy. It found the attorney fee of $15,708.50 for Georgia's attorney to be an administrative debt of the estate. It further found that no attorney fees for Linda's attorney are owed by the estate because her attorney chose not to file a claim for attorney fees. It assessed court costs against the succession.

Linda appeals the judgment of the trial court.

## DISCUSSION

### *Jurisdiction*

■ Georgia argues that Linda's appeal should be dismissed for noncompliance with the rules of this court in that her brief failed to identify a jurisdictional

basis for appeal as required by Uniform Rules of the Courts of Appeal ("URCA") Rule 2-12.4(A)(3).[2] She also argues that Linda filed an insufficient and irregular appeal bond and, therefore, did not comply with the requirements of La. C.C.P. art. 3308. She contends that this matter is before the appellate court without support by a surety bond and should be dismissed for lack of appellate jurisdiction.

In her reply brief, Linda argues that this court has jurisdiction and that Georgia's allegation of an insufficient appeal bond is untimely and meritless.

■ URCA 2-12.13 states that "[b]riefs not in compliance with these Rules may be stricken in whole or in part by the court, and the delinquent party or counsel of record may be ordered to file a new or amended brief." Thus, the appellate court has the discretion to impose a sanction for noncompliance with the Uniform Rules. The Louisiana Supreme Court in *U.S. Fire Ins. Co. v. Swann*, 424 So.2d 240 (La.1982), explained:

> In recognition of the fact that procedural rules are merely to implement the substantive law, as well as the fact that appeals are constitutionally guaranteed (La. Const. art. V, § 5 and § 10), this Court has consistently held that appeals are favored in the law and should be maintained unless a legal ground for dismissal is clearly shown. An appeal is not to be dismissed for a mere technicality. ... Unless the ground urged for dismissal is free from doubt, the appeal should be maintained.

We decline to resolve Georgia's complaints about the sufficiency of the suspensive appeal bond because the jurisdiction to test the sufficiency of the appeal bond rests exclusively in the trial court. La. C.C.P. art. 2088.

A judgment homologating a final account has the same effect as a final judgment in an ordinary action. La. C.C.P art. 3337.

Accordingly, these arguments lack merit, and the appeal will be maintained.

### Classification of Trailer as Separate Property

■ In her first assignment of error, Linda argues that the trial court erred in concluding that the 2001 trailer was the separate property of Georgia and in ordering that the funds obtained through the sale of the trailer be distributed to Georgia free of any claims of succession creditors. She contends that the funds used to purchase the 2001 trailer were partly separate property (the amount paid for pain, suffering and disability) and partly community property (reimbursement for lost wages and medical bills). She alleges that the documents executed at and immediately after the purchase of the 2001 trailer show that Georgia and Decedent intended the trailer to be jointly owned. She also argues that the evidence shows that the 2001 trailer was a community asset when purchased; and, therefore, the trial court erred in determining that it was Georgia's separate property.

Linda further argues that Georgia donated her interest in the trailer to Decedent in 2009, thus converting it into his separate property. She concedes that the act of donation is not in authentic form, but she argues that a manual donation was made in that Georgia physically delivered the trailer to Decedent when they separated and she moved out and that she demonstrated her intent to donate through the

---

**2.** URCA 2-12.4(A)(3) states that a brief shall contain "a jurisdictional statement setting forth the constitutional and statutory basis for the court to exercise appellate jurisdiction, with citations to applicable provisions."

inauthentic act of donation. She contends that Georgia's argument that the act of donation was made under duress should be rejected.

Georgia argues that she carried her burden of proof that the injury settlement was her separate property. She states that the trial court found that the settlement was general damages based on the severity of the claim and the notation on the check payment. She contends that there was no commingling of funds in the bank account to an extent that their identity as separate property was lost.

Georgia also argues that the trial court correctly determined that no donation of the trailer was confected. She contends that the evidence at trial proves that no manual gift ever occurred by any voluntary delivery of the mobile home and that there was no donative intent. She states that she was "pushed . . . out" of the trailer in 2009 when Decedent had an affair and was threatening and abusive toward her. She notes that she moved back into the trailer within two weeks of moving out in July 2009 and remained there until 2012 when she moved out for the last time after Decedent's new girlfriend moved in. She contends that any delivery of the mobile home was the result of brutality, compulsion and duress and that any donative intent was made under the threats of bodily harm and duress.

■ The classification of the trailer as community or separate property requires a factual determination. A court of appeal may not set aside a trial court's finding of fact "in the absence of 'manifest error' or unless it is 'clearly wrong'" or "has no reasonable factual basis." *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

La. C.C. art. 2341 defines separate property and states:

The separate property of a spouse is his exclusively. It comprises: property acquired by a spouse prior to the establishment of a community property regime; property acquired by a spouse with separate things or with separate and community things when the value of the community things is inconsequential in comparison with the value of the separate things used; property acquired by a spouse by inheritance or donation to him individually; damages awarded to a spouse in an action for breach of contract against the other spouse or for the loss sustained as a result of fraud or bad faith in the management of community property by the other spouse; damages or other indemnity awarded to a spouse in connection with the management of his separate property; and things acquired by a spouse as a result of a voluntary partition of the community during the existence of a community property regime.

La. C.C. art. 2344 addresses the classification of personal injury damages and states:

Damages due to personal injuries sustained during the existence of the community by a spouse are separate property.

Nevertheless, the portion of the damages attributable to expenses incurred by the community as a result of the injury, or in compensation of the loss of community earnings, is community property. If the community regime is terminated otherwise than by the death of the injured spouse, the portion of the damages attributable to the loss of earnings that would have accrued after termination of the community property regime is the separate property of the injured spouse.

■ The mere mixing of separate funds and community funds in the same

account does not of itself convert an entire account into community property. *Curtis v. Curtis*, 403 So.2d 56 (La.1981). Only when separate funds are commingled with community funds indiscriminately so that the separate funds cannot be identified or differentiated from the community funds are all the funds characterized as community funds. *Id.* Where separate funds can be traced with sufficient certainty to establish the separate ownership of property paid for with those funds, the separate status of such property will be upheld. *Id.* Further, there is a presumption that withdrawals from an account in which community and separate funds are commingled are presumed to come first from separate funds. *Reinhardt v. Reinhardt*, 31,174 (La.App. 2 Cir. 1/20/99), 728 So.2d 503, *writ denied*, 99–0883 (La. 6/18/99), 745 So.2d 22, and *writ granted*, 99–0723 (La. 6/18/99), 745 So.2d 609, and *aff'd in part, rev'd in part on other grounds*, 99–0723 (La. 10/19/99), 748 So.2d 423, citing *Cutting v. Cutting*, 625 So.2d 1112 (La.App. 3d Cir.1993), *writ denied*, 631 So.2d 453 (La.1994).

In the case *sub judice*, the 2001 trailer was purchased during the marriage of Georgia and Decedent for $21,500. The funds came from a bank account that solely held $42,500 Georgia received in a personal injury settlement and $2,500 Decedent received in a personal injury settlement. Check stubs introduced into evidence state that the amount Georgia received was for "general damage claims" and the amount Decedent received was for "loss of consortium claim." The trial court correctly found that Georgia's settlement was for general damages, such as pain and suffering, and not for special damages, such as lost wages; and, therefore, the settlement was her separate property. Further, the only two deposits made into the bank account were the two settlement checks, so the separate funds of Georgia's settlement could be identi-

fied and differentiated from the other funds in the account. Based on the presumption that withdrawals from an account in which community and separate funds are commingled come first from separate funds, Georgia's separate funds were used to pay for the 2001 trailer. These funds can be traced with sufficient certainty to establish the separate ownership of the property paid for with those funds; and, therefore, the 2001 trailer is Georgia's separate property.

A donation *inter vivos* is a contract by which a person, called the donor, gratuitously divests himself, at present and irrevocably, of the thing given in favor of another, called the donee, who accepts it. La. C.C. art. 1468. A donation *inter vivos* shall be made by authentic act under the penalty of absolute nullity, unless otherwise expressly permitted by law. La. C.C. art. 1541. An authentic act is a writing executed before a notary public ⌊16⌋or other officer authorized to perform that function, in the presence of two witnesses, and signed by each party who executed it, by each witness, and by each notary public before whom it was executed. La. C.C. art. 1833(A). The donation *inter vivos* of a corporeal movable may also be made by delivery of the thing to the donee without any other formality. La. C.C. art. 1543. To establish a donation *inter vivos* of a manual gift, the donee has the burden of proving by strong and convincing evidence donative intent of the donor. *Thomson v. Thomson*, 34,353 (La.App. 2 Cir. 1/24/01), 778 So.2d 736. Donative intent is a factual issue and is subject to the manifest error standard of appellate review. *Id.*

■ In the case *sub judice*, the act of donation was signed by Georgia and Decedent and was notarized, but it was not signed by two witnesses. Therefore, the act of donation is not an authentic act

pursuant to La. C.C. art. 1833(A) and was not an effective donation *inter vivos* pursuant to La. C.C. art. 1541. Further, there was not a valid manual donation of the trailer[3] pursuant to La. C.C. art. 1543. The evidence presented at trial does not demonstrate that Georgia had the necessary donative intent to gratuitously divest herself, at present and irrevocably, of the trailer. The act of donation does not prove that Georgia had donative intent. She testified that she did not want to sign the act of donation, but did so under duress because Decedent threatened her. The fact that the act of donation was not completed with the signatures of witnesses suggests that Georgia did not have the intent to donate the trailer. Further, there is no evidence of a voluntary manual delivery of the trailer. Georgia testified that she was forced to move out of the trailer in 2009 because Decedent was having an affair and his girlfriend moved into the trailer. Georgia testified that she moved back into the trailer two weeks later and remained there until 2012 when Decedent had another affair. Other witnesses at trial testified that Georgia lived in the trailer until 2012. At times, Georgia left the trailer due to martial problems, not to deliver the trailer to Decedent.

We find that the trial court was not clearly wrong in determining that no valid donation occurred and that the 2001 trailer is Georgia's separate property. Accordingly, this assignment of error lacks merit.

### Payment of Attorney Fees

In her second assignment of error, Linda argues that the trial court erred in ordering the succession to pay attorney fees of $15,708.50 plus costs to an attorney who represented both the succession and Georgia without making any attempt to take account of the conflict of interest

inherent in the dual representation and in the absence of sufficient evidence to support the claimed fee. She states that Mr. Hurd represented Georgia individually and in her capacity as co-administratrix of the succession. Linda contends that he performed services that were in the interest of Georgia and were adverse to the interests of the succession, e.g., asserting that the 2001 trailer was Georgia's separate property. She notes that Mr. Hurd declined to provide a copy of his fee statement on the ground of attorney-client privilege and contends that this indicates that he regarded Georgia as his client and not the succession because attorney-client privilege is inapplicable when an attorney undertakes dual representation of two clients. She argues that Mr. Hurd is estopped from claiming a fee from the succession due to the dual representation and conflict of interest.

Georgia argues that the trial court did not abuse its discretion so that a reduction of the award of attorney fees would be required. She notes that Linda is challenging the substantive amount of the attorney fees award and took no steps to investigate the basis of the fees before trial. She states that the proposed attorney fees were created by records compiled, the services provided and the expenditures over years of litigation. She contends that the lengthy litigation was due to Linda's "irrational litigation strategy" and the need to respond to personal attacks made by Linda. She argues that the trial court was in the best position to evaluate the efforts of and the actions taken by the parties.

The Louisiana Fourth Circuit Court of Appeal has set forth the Louisiana jurisprudence on this issue and stated:

---

**3.** For the purposes of this opinion, we assume that the trailer is a movable. We note that

nothing in the record suggests that the trailer was immobilized.

Louisiana law has long recognized that an executor or an administrator of a succession may obtain an attorney to aid in the carrying out of the executor's duties and to defend the succession against adverse claims made against it. *Succession of Jenkins*, 481 So.2d 607 (La.1986); *reh. den.*, (Feb. 21, 1986); *Succession of Demarest*, 418 So.2d 1368 (La.App. 4th Cir.1982); *writ den.*, 422 So.2d 158 (La.1982). Furthermore, the costs of such legal representation may be charged to the succession. *Atkins v. Roberts*, 561 So.2d 837 (La.App. 2 Cir. 1990); *Succession of Hoffpauir*, 443 So.2d 1166 (La.App. 3 Cir.1983). However, Louisiana law also adopts the principle that where the legal representation is primarily for the personal benefit of the executor and not the estate, such fees may not be paid from the property of the succession. Where the executor has an individual and special interest which she contests to protect against others, the succession shall not be responsible for the legal costs incurred. *Osterland v. Gates*, 400 So.2d 653 (La. 1981); *Atkins v. Roberts*, 561 So.2d 837 (La.App. 2 Cir.1990); *Succession of Kelly*, 305 So.2d 704 (La.App. 2 Cir.1974). *Succession of Haydel*, 606 So.2d 42 (La. App. 4th Cir.1992).

Whether an attorney's work was for the benefit of the succession is a question of fact that cannot be set aside absent manifest error. *See Rosell v. ESCO, supra.*

In the case *sub judice*, Mr. Hurd, on behalf of Georgia, argued that the 2001 trailer was Georgia's separate property. In this succession, the 2001 trailer was the most valuable potential asset. Georgia and Mr. Hurd did not demonstrate that his work was for the benefit of the succession. The argument that the 2001 trailer was Georgia's separate property was clearly for her personal benefit and was adverse to the succession's interests. Further, we note the unreasonableness of the attorney fees requested in this case where the attorney was aware of the lack of assets and the potential insolvency of the succession. We find, therefore, that the trial court erred in determining that Mr. Hurd's attorney fees were a debt of the succession. The fees for the representation of Georgia's personal interests shall not be paid from the property of the succession.

Accordingly, this assignment of error has merit. The portion of the trial court's judgment that determined Mr. Hurd's attorney fees to be a debt of the succession is reversed.

### Right to Reimbursement

In her third assignment of error, Linda argues that the trial court erred in failing to recognize the succession's right to reimbursement arising from the fact that community funds were used to pay a separate debt of Georgia. Linda alleges that $60,000 of community funds was used to defray Georgia's separate debt incurred to purchase the 1998 trailer and that the succession has a claim for reimbursement for half of this amount.

Georgia argues that this claim was not raised at trial and was first mentioned in Linda's post-trial memorandum. She states that the trial court did not rule on this reimbursement claim; and, therefore, it is not properly before the court on appeal and should be denied as premature.

The trial court did not address this reimbursement claim in the judgment at issue on appeal. Therefore, this argument is not properly before this court on appeal.

### Funeral Bill

In her fourth assignment of error, Linda argues that the trial court erred in limiting the funeral bill to $500. She notes that the trial court determined that the succession is insolvent, but argues that, if

this court on appeal "correctly decide[s]" the issues of the classification of the 2001 trailer and the reimbursement claim for the 1998 trailer, the succession will be solvent. She contends that the next succession debt in order of priority is the funeral expense, and this expense should be paid in full from the succession assets.

Georgia contends that the succession is insolvent; and, therefore, the trial court properly ordered that Linda be paid the statutory maximum of $500 in full satisfaction of the interment charges.

Funeral charges are those which are incurred for the interment of a person deceased. La. C.C. art. 3192. If the property of the deceased is so encumbered as not to suffice for the payment of his creditors, the funeral charges may, upon the request of any of them, be reduced by the judge to a reasonable rate, regard being had to the station in life which the deceased held and which his family holds. La. C.C. art. 3193. In the case of the reduction, the judge can never allow, at the expense of the estate, on any account whatever, more than $500 for all the expenses occasioned by the interment of the deceased. La. C.C. art. 3194.

As discussed above, the 2001 trailer is Georgia's separate property and, therefore, is not an asset of the succession. Further, the reimbursement claim for the 1998 trailer is not properly before this court on appeal. The record before this court demonstrates that the succession is insolvent because the debts, including approximately $36,000 in medical bills, exceed the assets, i.e., Decedent's $500 interest in the community movables. Therefore, the trial court did not err in reducing the funeral charges to $500.

Accordingly, this assignment of error lacks merit.

## CONCLUSION

For the foregoing reasons, we reverse the portion of the trial court's judgment that determined the fees of Appellee Georgia Dysart's attorney to be a debt of the succession. All other aspects of the trial court's judgment are affirmed. Costs of appeal are assessed equally to Appellant Linda Dysart and Appellee Georgia Dysart.

**AFFIRMED IN PART; REVERSED IN PART.**