STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

21-359

SHARON GUILLORY CHRISTIE

VERSUS

JEFFREY CHAD CHRISTIE

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 254,493
HONORABLE PATRICIA EVANS KOCH, DISTRICT JUDGE

**********

VAN H. KYZAR
JUDGE

**********

Court composed of Billy Howard Ezell, John E. Conery, and Van H. Kyzar, Judges.

AFFIRMED.

Gregory N. Wampler
Lemoine & Wampler
607 Main Street
Pineville, LA 71360
(318) 473-4220
COUNSEL FOR DEFENDANT/APPELLANT:
    Jeffrey Chad Christie

Todd Lee Farrar
1603 Melrose Street
Pineville, LA 71360
(318) 448-4040
COUNSEL FOR PLAINTIFF/APPELLEE:
    Sharon Guillory Christie

**KYZAR, Judge.**

Defendant, Jeffrey Chad Christie, appeals the judgment of the trial court partitioning the property of the former community of acquets and gains between he and his former wife, Sharon Guillory Christie. For the reasons herein assigned, we affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

Defendant, Jeffrey Chad Christie (Jeff), and Plaintiff, Sharon Guillory Christie (Sharon), were divorced on January 9, 2017. During the proceedings, a judgment of separation of community property was signed on September 6, 2016. Following the divorce, the parties reached certain agreements as to the extent and value of the property of the community of acquets and gains that existed between them, reducing the same to a cash sum of $198,483.64, that was held in trust pending a decision following the partition trial. Further, the parties submitted a joint stipulation with agreements as to certain facts and concerning various credits that each would be entitled to in the final partition, leaving only a few contested claims for offsets, reimbursements, and/or credits to be determined at trial. The case was tried on October 16, 2020, and after taking the matter under advisement, the trial court issued written reasons on November 16, 2020.

The trial court accepted that the total community assets are represented by the sum of $198,483.64, held in trust, and found that initially the parties are entitled to one-half each of that total sum. The trial court then applied the stipulated credits or reimbursements to each party, and made the following findings related to contested items of credits or reimbursements:

> The Court finds that the community owned $15,000.00 in gold, and further finds that Jeff is in possession of that gold, therefore Jeff is assigned $15,000.00 in gold value, which results in a credit to Sharon

1

of $7,500.00 from the proceeds to which Jeff would otherwise be entitled.

Jeff is assigned $60,000.00 in increased value to his separate property as the result of community labor, which results in a credit to Sharon of $30,000.00 from the proceeds to which Jeff would otherwise be entitled.

Jeff is assigned rentals on rental properties totaling $42,400.00, based upon the Court finding that Jeff received rental payments on community property. The Court's findings results in a credit for rental receipts to Sharon of $21,200.00 from the proceeds to which Jeff would otherwise be entitled.

After calculating the value of the stipulated credits, and those contested credits determined by the trial court, the judgment partitioned the community funds of $198,483.64, awarding reimbursements to Jeff totaling $68,107.74 and reimbursements to Sharon totaling $69,110.00, leaving a balance of community funds of $61,265.90 with each party receiving their one-half, or $30,632.95. Judgment was signed on January 27, 2021. This appeal followed wherein Jeff makes the following assignments of error:

(1) The Trial Court erred in awarding Sharon a value for increase in the separate property of Jeff attributable to community labor.

(2) The Trial Court erred in awarding Sharon a value for the alleged gold owned by the community.

(3) The Trial Court erred in awarding to Sharon rental value receipts on community owned rental properties allegedly received by Jeff.

**STANDARD OF REVIEW**

It is well recognized that an appellate court is not to set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). In order to reverse the findings of the trial court, a two-tiered test must be applied: (a) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court; and (b) the

2

appellate court must further determine that the record establishes that the finding of the trial court is clearly wrong (manifestly erroneous). *Mart v. Hill*, 505 So.2d 1120 (La.1987).

"The trial court is vested with great discretion in effecting a fair partition of community property." *Arterburn v. Arterburn*, 15-22, p. 4 (La.App. 3 Cir. 10/7/15), 176 So.3d 1163, 1167 (citing *Collier v. Collier*, 00-1263 (La.App. 3 Cir. 7/18/01), 790 So.2d 759, *writ denied*, 01-2365 (La. 12/7/01), 803 So.2d 30). Reasonable determinations and inferences of fact should not be disturbed on appeal, even when the appellate court believes its inferences are more reasonable than those of the fact finders. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). Further, a reviewing court must keep in mind that if a trial court's findings are reasonable based upon the entire record and evidence, an appellate court may not reverse said findings, even if it is convinced that had it been sitting as trier of fact, it would have weighed that evidence differently. *Housley v. Cerise*, 579 So.2d 973 (La.1991). The basis for this principle of review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts. *Canter v. Koehring Co.*, 283 So.2d 716 (La.1973).

## DISCUSSION

### *Increased Value of Jeff's Separate Property*

Jeff first asserts that the trial erred in awarding Sharon a value for increase in the separate property of Jeff attributable to community labor. This claim relates to Jeff's separate ownership of at least a one-half interest in a camp house property on Toledo Bend. During the marriage, allegedly with community funds and/or labor, Jeff, along with the help of Sharon, made improvements to the camp house.

3

In its written reasons for judgment, the trial court summarized the factual findings and basis for its decision, as follows:

> Jeff testified that in 2010 he and his father made a deal that if Jeff would build a camp, his father would purchase the property and all the materials with Jeff sharing in the "ownership" and enjoyment of the camp. Sharon introduced a listing of materials that she alleges the community purchased. Jeff claims that his father reimbursed or purchased all materials except for perhaps some home decorating items. Jeff also admits that the monthly utility bills were paid by Jeff. The parties did agree that it was Jeff following the framing of the camp, that did the primary carpentry work on the camp along with Sharon's assistance in that construction and finishing work. Sharon expressed that she heard the investment was $60,000 for the camp. Jeff disputed any cash investment by him but instead was sweat equity. Clear to this Court is that there was a community effort placed into the separate property of Jeff.

In setting the value of the community labor and investment into Jeff's separate property, the court stated in its reasons as follows:

> Based upon the testimony, the property at Toledo Bend was an empty lot and following the framing efforts the remainder of the construction was placed on Jeff who in turn sought assistance from Sharon. The end result was a camp used by Jeff and Sharon. The Court assigns a value for the community time and expenses of the Toledo Bend camp at $30,000. The sweat equity over the many months of work before the property became a livable, enjoyable camp for the family.

In a footnote to the finding, the trial court noted that "[a]t $10/hour, 20 hours each weekend for 52 weeks would provide a value of $20,800 along with expenses of the home decorating or other personal touches for the amount of $30,000." In the final judgment, "Jeff is assigned $60,000.00 in increased value to his separate property as the result of community labor, which results in a credit to Sharon of $30,000.00 from the proceeds to which Jeff would otherwise be entitled."

Louisiana Civil Code Article 2366 provides in pertinent part that when "community property has been used during the existence of the community property regime" for the "acquisition, use, improvement, or benefit of the separate property of a spouse, the other spouse is entitled to reimbursement for one-half of

4

the amount or value that the community property had at the time it was used." Further, Louisiana Civil Code Article 2368 states that "[i]f the separate property of a spouse has increased in value as a result of the uncompensated common labor or industry of the spouses, the other spouse is entitled to be reimbursed from the spouse whose property has increased in value one-half of the increase attributed to the common labor." In *Salley v. Salley*, 95-387, p. 3 (La.10/16/95), 661 So.2d 437, 438-39, the supreme court provided:

> [A] claimant spouse under Article 2368 has the burden of proving: (1) the property is separate, (2) the property increased in value, and (3) the increase in value was based on the uncompensated or undercompensated labor of the other spouse; the burden then shifts to the other spouse to prove that the increase in value was due to factors other than the uncompensated or undercompensated labor.

Jeff argues that the trial court's judgment found that the separate property of Jeff had increased in value by $60,000.00 as the result of community labor, and not that community funds were expended on the separate property. Therefore, he asserts, the issue of the expenditure of community funds is moot, and the only issue relative to the increase of the value of Jeff's separate property is the correctness of the finding that the property increased in value by $60,000.00 as the result of uncompensated community labor. In this light, Jeff argues that there was no proof offered of the pre-improvement value of the camp nor the post-improvement value of the camp, and, thus, the increase in value was not proven. However, we note that the trial court's reasons for judgment assign value for both community labor and expenses.

Contrary to Jeff, Sharon argues that the trial court was able to determine what value was added to the camp by weighing the testimony of Doug Selman, a contractor, who testified that he connected Jeff to some house framers to construct the framework of the camp. It is noted from Mr. Selman's testimony that the

5

framing, or drying in, of the construction process amounts to approximately twenty percent of the total building process. Sharon points out that the trial court also had the benefit of an exhibit in Jeff's own handwriting, which was purported to be a list of the materials used and expenses for the camp's construction, totaling $33,230.00. She asserts that Jeff even admitted to several expenses the community paid toward the camp, including a gravel drive. Sharon contends that the parties agreed that it was Jeff, following the framing of the camp, that did the primary carpentry work on the camp, while Sharon assisted in the construction and finishing work. Sharon asserts that the factual findings of the trial court as to the value of the camp's improvement and expenses are not manifestly erroneous and, thus, should be affirmed.

"It is well settled that, in valuing assets, the trial court is not required to accept, at face value, the valuation placed on assets by either spouse. If the trial court's valuations are reasonably supported by the record and do not constitute an abuse of discretion, its determinations should be affirmed." *Alford v. Alford*, 94-1464, p. 7 (La.App. 3 Cir. 4/5/95), 653 So.2d 133, 136. While it is true, as Jeff asserts, that there was no pre-improvement value of the campsite itself introduced, nor any post improvement appraisal, the trial court took note that the land was previously an "empty lot" and after the community labor and expenses, there was a useable camp house on the property.[1] Indeed, Sharon testified as to the many occasions the camp was used by the family during the marriage.

_____

[1] Jeff was ordered by the court on October 15, 2018 "to cooperate with the appraisal of the Toledo Bend camp listed in defendant's father's name and facilitate [plaintiff's] appraiser Gary Hollingsworth being granted access to the Sabine Parish Toledo Bend Camp property for the purpose of appraisal of that land and assets." However, this was apparently not done, as no such appraisal was introduced at trial.

There is no dispute that uncompensated community labor of both Jeff and Sharon was used during the construction of the camp, which is Jeff's separate property, owned in partnership with his father, each having an undivided one-half interest. It is also not disputed that the lot was an empty one prior to the construction of the camp house. Sharon testified that Jeff told her that he was able to build the camp house for $60,000.00 and that he was very proud of his work and efforts to do so. Jeff agreed that he was proud of his work.

It was conclusively proven that unreimbursed community labor was used to construct the house, where no house existed prior thereto. Jeff's own handwriting showed expenses totaling over $30,000.00 were purchased. Jeff argues there was also work done for Sharon's parents and there was no proof that the expenses listed were for the camp. However, it is noted that the testimony showed that the work for Sharon's parents was the construction of a deck, and earlier for some remodeling, consisting of a step-down living room. The materials list introduced as evidence was obviously for a house construction, including appliances, bathroom supplies including toilets, sinks, faucets, and other such items used to finish out a place of abode, not a deck. Given this evidence, we find it was not manifestly erroneous for the trial court to assess the value of $60,000.00 as the increased value of Jeff's separate property for the uncompensated labor and expenses from the community.

### Value and Possession of Community Gold

In his next assignment of error, Jeff asserts that the trial court erred in awarding Sharon $7,500.00 to reimburse her for the total value for the alleged gold owned by the community, set by the trial court at $15,000.00. He argues that no evidence was presented at all of the amount or type of gold coins or bullion

7

purchased during the community, nor was there any evidence of the value of the gold. Further, Jeff asserted that he gave the gold to Sharon; Sharon asserted that he did not. He argues that aside from the admission of the parties that some amount of gold was purchased during their marriage for some unknown price at some unknown time, there is no evidence upon which to base any judgment awarding either party the value of the gold owned by the community.

In its written reasons for judgment, the trial court set out its findings of fact concerning the gold bullion:

> Testimony at trial concerning the investment by the community into gold bullion and/or coins. The gold was stored in an enclosed PVC pipe wrapped in a blue cloth. Sharon and Jeff used the gold as collateral to secure a loan from Sharon's parents. There was a discrepancy in the value of the coins. Sharon alleges the coins had the same value as the loans - $45,000 while Jeff alleges that it was much less than that possibly $15,000. No other information (certificates of purchase) was able to be located confirming the actual investment in gold. Each alleges the other was in possession of the gold. Sharon describes the scenario of Jeff giving her the PVC container as they split up yet did not open the container for several months later to discover the container held simply re-bar wrapped in a blue cloth. Jeff describes that he did not keep the gold but did give the gold to Sharon.
>
> After reviewing the testimony and examining the re-bar and the container, the Court assigns a value to the gold at $15,000 and also accepts the testimony of Sharon that she did not actually receive the gold. Gold has a weight to it but the container is so small that it is not conceivable that the container could actually hold $45,000 worth of gold.

Louisiana Revised Statutes 9:2801(A)(4)(a) provides that the trial court shall value community assets as of the time of the trial. "When the parties do not submit evidence of the current value of community assets, the trial court does not err in making its valuations based upon other evidence presented by the parties[,]" where the valuations given by the court are "supported by evidence in the record." *McLaughlin v. McLaughlin*, 17-645, p. 9 (La.App. 5 Cir. 5/16/18); 247 So.3d 1105,

8

1113 (citing *Gill v. Gill*, 39,406 (La. App. 2 Cir. 3/9/05), 895 So.2d 807 and *Ellington v. Ellington*, 36,943 (La. App. 2 Cir. 3/18/03), 842 So.2d 1160, *writ denied*, 03-1092 (La. 6/27/03), 847 So.2d 1269.)

The trial court's assessment of the testimony at trial is an accurate reflection of that appearing from the record on review. Sharon testified that the gold had a value of at least $45,000.00, the amount of the loan it was pledged to secure. In his testimony, Jeff stated that he purchased $40,000.00 worth of gold coins and bars during the marriage. However, Jeff argues in brief that its value was no more than $15,000.00, as acknowledged by the trial court in its reasons for judgment. In support of this, he testified that the $40,000.00 in gold bullion, in bars and coins as he purchased it, would not have fit into the PVC container that was introduced into evidence as having contained the gold owned by the parties. The trial court accepted Jeff's valuation of $15,000.00, noting the size of the container. The trial court also accepted Sharon's testimony that Jeff never transferred possession of the gold to her, merely giving her the cases in which they were originally stored, that were then filled with re-bar instead of gold. "[T]he trial court is accorded broad discretion in resolving community property disputes" and its "findings of fact are subject to the manifest error/clearly wrong standard of review." *Keenan v. Keenan*, 15-828, p. 5 (La.App. 3 Cir. 2/3/16), 186 So.3d 289, 295, *writ denied*, 16-418 (La. 4/15/16), 191 So.3d 590. We can find no error in the factual conclusions of the trial court here.

## *Reimbursement for Community Rental Income Received*

In his final assignment, Jeff claims that the trial court erred in awarding to Sharon rental value receipts on community owned rental properties allegedly received by Jeff. It was undisputed that the parties owned certain rental properties

during the marriage. Jeff acknowledges in brief, and the parties stipulated to the trial court, that "Sharon has a claim for one-half (1/2) of the funds collected by Jeff for rental properties, which Jeff claims to be $15,317.00. One-half of that number is $7,658.50. Sharon claims more rental monies were collected." Thus, the issue before the court was not whether Sharon was entitled to reimbursement for one-half of the rentals received by Jeff, but the actual amount of that reimbursement.

In written reasons for judgment, the trial court set forth the following as to its findings:

> The couple had several rental properties which were transferred to Sharon with an assigned value of $35,000. Testimony revealed that the properties were at one time rented regularly however the properties began to decline which reduced the value of the property and the rental income. The rental income during the marriage provided a flow of cash which was not reflected on income tax reporting.

> According to the Jeff's family law affidavit, he received rental incomes of $1,200 per month, which in June 2017 he reported as his only income. Jeff's tax return indicates an income of $15,317 which reflects a reduction for any expenditures on the properties. Testimony also revealed that only one of the properties is now actually rentable and that even when tenants were in the properties, monthly rents were not paid timely or regularly. The rent amounts ranged from $100/week to $400/month with the highest amount for the nicest of the three properties at $550/month. One witness was not available but the court did hear a recording from that witness who was a previous tenant. His testimony supported that of both Jeff and Sharon that the properties have declined and that only one of the properties is actually habitable.

> The parties have been separated since December 2015 without a separation of property. From all accounts the rental properties were rentable in 2016 and 2017 with a decline occurring in 2018, 2019 and especially in the year of 2020. Accepting the affidavit of Jeff filed in 2017, the rental value for 2016 and 2017 is set at $1200 per month. That amount is reduced for the year 2018 to $800 per month and then in 2019 and 2020 to $500 per month.

> Jeff nor Sharon reported any re-investment into the rental properties, so the Court has set forth the figures above recognizing that tenants are not always timely nor are payments made in full especially with properties with the described challenges as reported.

In recapitulating its findings, the trial court concluded that the rentals received by Jeff for the years 2016 and 2017 were set at $1,200.00 per month, $800.00 per month for 2018, and $500.00 for 2019 and 2020. The final judgment assigned a total value of the rentals received by Jeff for these periods at $42,400.00, thus entitling Sharon to a reimbursement of $21,200.00.

Jeff asserts that the trial court erred in fixing the amount of rental income he received prior to the partition, claiming he only received $15,317.00, of which Sharon would be entitled to a credit of $7,658.50. This figure was claimed by Jeff to have been derived from his tax returns.[2] He argues that he transferred the rental properties to Sharon by order of the court on or about June 18, 2019 and, thus, at the least, the trial court erred by assessing him with rental receipts for the periods after the transfer, especially considering Sharon's admissions in her testimony that the properties were not in fact habitable or rentable after she took possession of them.

We note that the trial court assessed rental receipts for the years 2016 and 2017 at $1,200.00 per month. This figure was derived from Jeff's own "Family Law Affidavit" dated June 2, 2017, introduced into evidence. Therein, Jeff admits to earning $1,200.00 per month in net rental income. In his testimony, Jeff admitted that the rental income he referred to in the affidavit was the rental income from the houses owned by the parties, and that he had no other rental income or royalties other than from those sources. This rental income equals $14,400.00 per year for the years 2016 and 2017. Given Jeff's admissions that he did in fact receive rental income, and his affidavit admitting to the monthly income of

---

[2] The return or returns were not filed into evidence, nor is it clear that the amount was earned in one tax year, or multiple years.

11

$1,200.00, we find no error in the trial court's assessment of this income to Jeff for the years 2016 and 2017, for a total of $28,800.00.

Based on the testimony of the parties that the rental properties declined in 2017 and afterwards, and the rental receipts also declined, the court reduced the rental receipts attributed to Jeff to $800.00 per month for 2018 and further to $500.00 per month in 2019 and 2020. Jeff argues that he transferred the rental properties to Sharon in 2019 and, thus, the trial court erred in assessing him with receipts beyond that date. While we agree that Jeff should not be liable to Sharon for any rental receipts after the transfer, we note that the trial court did not actually assess Jeff with any income after that date. The total assessed to Jeff by the trial court in the final judgment was $42,200.00, resulting in the credit to Sharon of one-half of that amount, or $21,200.00. Given that the income for 2016 and 2017 was 28,800.00, it is clear the trial court only assessed another $13,600.00 in rental income to Jeff for the remainder of 2018 and forward. Using the trial court's assessment of the income, this amounts to $9,600.00 for 2018 ($800.00 per month for 12 months) and $4,000.00 for the first eight months of 2019, January through August, at $500.00 per month. This corresponds with the date on which the court ordered transfer of the rental properties to Sharon.[3] Accordingly, we find that the trial court did not assess to Jeff any rental income after the transfer. We further find no manifest error in the assignment to Jeff of the rental income for these periods based on the evidence before the trial court.

---

[3] By court order dated August 14, 2019, the rental properties were ordered to be transferred to Sharon thirty days after payment of certain sums. In her testimony, Sharon admitted that Jeff signed a quit claim deed for the transfer.

## DECREE

For the reasons herein set forth, we affirm the judgment of the trial court.

All costs of this appeal are assessed to Appellant Jeffery Chad Christie.

**AFFIRMED.**